IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUNDEXCHANGE, INC.<br><br>                 Plaintiff,<br><br>v.<br><br>SIRIUS XM RADIO INC.<br><br>                 Defendant. | Civil Action No. ___<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**PRELIMINARY STATEMENT**

1.    Under the Copyright Act, entities such as Defendant Sirius XM Radio Inc. ("Sirius XM") benefit from a statutory license for the rights necessary to digitally perform sound recordings protected by federal copyright. As a result of this license, these entities can digitally transmit sound recordings to their millions of paying subscribers without fear of copyright infringement. But the statutory license is not free: the Copyright Act requires licensees to pay royalties for the use of copyright owners' valuable original content. By regulation, those royalties must be paid to SoundExchange, Inc. ("SoundExchange"), a non-profit organization authorized to collect digital performance and related royalties and distribute them to performing artists and copyright owners.

2.    Sirius XM is the country's only satellite digital audio radio service ("SDARS"). The royalties that Sirius XM must pay under the statutory license are set periodically in regulations prescribed by the federal Copyright Royalty Board ("CRB"). For the time period 2007-2012, the amount that Sirius XM was required to pay was the product of two numbers: (1) a percentage set by the CRB (the "royalty rate"); and (2) Sirius XM's "Gross Revenues" as

defined by the CRB. Thus, Sirius XM's Gross Revenues were the royalty base against which its royalty obligations were to be calculated.

3. The CRB's regulations define Gross Revenues broadly. They also set forth exactly what Sirius XM may exclude from Gross Revenues for the purpose of calculating its royalty obligation.

4. Starting from at least January 1, 2007, and until December 31, 2012 (the "relevant time period"), Sirius XM systematically underpaid SoundExchange for the statutory license. Rather than paying a percentage of Gross Revenues as that term is defined in the federal regulations, Sirius XM devised its own definition of Gross Revenues – a definition that substantially reduced its royalty payments to SoundExchange. Sirius XM's definition improperly reduced its reported Gross Revenues in three ways. *First*, from January 1, 2007 until December 31, 2012, Sirius XM improperly reduced its Gross Revenues by an amount purportedly attributable to performances of sound recordings fixed prior to February 15, 1972 ("pre-1972 sound recordings"). *Second*, from at least October 2008, Sirius XM excluded from its reported Gross Revenues the incremental revenue it received from the difference in price between its standard package (which includes both music and talk channels) and its "Sirius XM Premier" package (which includes all the content in the standard package as well as certain additional all-talk channels).[1] *Third*, Sirius XM and its legal predecessor excluded all revenue derived from its *Family Friendly* and *Mostly Music* packages even though those packages contained many channels broadcasting recordings covered by the statutory license.

---

[1] Sirius XM, the product of a merger between formerly-separate Sirius and XM services, continues to offer separately-branded Sirius Premier and XM Premier packages, as well as a co-branded package (Sirius XM Premier). On information and belief, Sirius XM has been erroneously excluding incremental subscription revenue from all three packages in the same manner. For simplicity, this Complaint uses "Sirius XM Premier" to refer to all three packages.

5. None of Sirius XM's unilateral amendments to the exclusions and deductions to the definition of Gross Revenues was permitted under federal law. SoundExchange now brings this action to recover the royalty amounts Sirius XM has underpaid as a result.

## JURISDICTION AND VENUE

6. This is a civil action seeking damages under the Copyright Act, 17 U.S.C. § 101, *et seq.*

7. This Court has original subject matter jurisdiction over Copyright Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant Sirius XM resides in this District, and a substantial part of the events giving rise to this suit have occurred in this District.

9. This Court has personal jurisdiction over Sirius XM because Sirius XM (i) resides in this District; (ii) has substantial contacts within the United States, including in this District; and (iii) has transacted business throughout the United States, including in this District.

## PARTIES

10. Plaintiff SoundExchange, Inc. is an independent nonprofit organization organized and existing under the law of the State of Delaware, with its headquarters at 733 10th Street, N.W., 10th Floor, Washington, DC 20001. The CRB has designated SoundExchange as the sole entity in the United States to collect digital performance royalties from statutory license users and to distribute those royalties to performing artists and copyright owners. Specifically, SoundExchange is charged by regulation with administering the statutory license, *see, e.g.*, 17 U.S.C. § 114(e)(1); 37 C.F.R. § 380.4; *id.* at § 370.3, collecting and distributing statutory royalties, 17 U.S.C. § 114(e)(1); *id.*, and enforcing the terms of the statutory license, *see* 17

U.S.C. § 114(g)(3).  Pursuant to this authority, SoundExchange collects statutory royalties from satellite radio, Internet radio, cable TV music channels, and other types of services for transmission of sound recordings, and distributes those royalties to artists and record companies.

11. Defendant Sirius XM Radio Inc. is a corporation organized and existing under the law of the State of Delaware, with its principal place of business located at 1221 Avenue of the Americas, 36th Floor, New York, NY 10020.  Sirius XM also has offices in Washington, D.C., and studio facilities throughout the country.  Sirius XM is the only operator of an SDARS.

## FACTUAL ALLEGATIONS

**A.   The Statutory Framework for the Licensing of Digital Performance Rights**

12. Section 106 of the Copyright Act grants the owner of a copyright in a sound recording the exclusive right to perform and reproduce "the copyrighted work publicly by means of a digital audio transmission."  17 U.S.C. § 106(6).

13. In turn, Congress granted various entities, including SDARS, a "statutory license," 17 U.S.C. §§ 112; 114(d)(2), to render these digital public performances of copyrighted sound recordings.  Copyright owners are unable to withhold this license, which allows Sirius XM to publicly perform all covered recordings (by transmitting them to its millions of paying subscribers) without fear of copyright infringement.

14. The federal statutory license, however, is not free.  Rather, in the event that copyright owners and SDARS are unable to agree on the license's royalty rates and terms, the Copyright Act requires the CRB to "determine reasonable rates and terms of royalty payments" for the statutory license.  17 U.S.C. § 114(f)(1)(A).  The Copyright Act provides that the CRB-set rates "shall . . . be binding on all copyright owners of sound recordings and entities performing sound recordings," including Sirius XM.  *Id.* § 114(f)(1)(B).

15. Since shortly after enactment of the statutory license, SoundExchange and its predecessor have been designated by the CRB and its predecessors to collect and distribute statutory royalties. Notice and Recordkeeping for Digital Subscription Transmissions, 63 Fed. Reg. 34,289, 34,292-94 (June 24, 1998). The Copyright Act directs how those royalties are to be distributed. 17 U.S.C. § 114(g)(2)(A)-(D). The Copyright Act also provides that a non-profit agent such as SoundExchange may deduct certain costs from the royalty payments that it distributes. These costs include costs the non-profit agent incurs in enforcing performance rights subject to the statutory license. *Id.* at § 114(g)(3)(A)-(C).

16. On January 24, 2008, the CRB promulgated its regulations setting the license fees that the SDARS would pay for 2007 to 2012. *See* Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 73 Fed. Reg. 4080, 4099 (Jan. 24, 2008) ("2007-2012 CRB Decision"). Those regulations remained in effect from January 1, 2007 to December 31, 2012. The regulations prescribed (as they still do now) that royalty payments were to be made to SoundExchange.

17. Under the CRB's regulations, Sirius XM's royalty fee was to be calculated as a percentage of its Gross Revenues. Specifically, Sirius XM was to pay 6.0% of its Gross Revenues for 2007 and 2008, 6.5% of its Gross Revenues for 2009, 7.0% of its Gross Revenues for 2010, 7.5% of its Gross Revenues for 2011, and 8.0% of its Gross Revenues for 2012. 2007-2012 CRB Decision, 73 Fed. Reg. at 4098.

18. The CRB promulgated regulations that defined "Gross Revenues" for purposes of the royalty payment calculation. In relevant part, those regulations stated:

> (1) Gross Revenues shall mean revenue recognized by [Sirius XM] in accordance with GAAP from the operation of an SDARS, and shall be comprised of the following:

    (i) Subscription revenue recognized by [Sirius XM] directly from residential U.S. subscribers for [Sirius XM's] SDARS; and

    (ii) [Sirius XM's] advertising revenues, or other monies received from sponsors, if any, attributable to advertising on channels other than those that use only incidental performances of sound recordings . . .

(3) Gross revenues shall exclude: . . .

    (vi) *Revenues recognized by* [Sirius XM] for the provision of . . .

        (B) Channels, programming, products and/or other services *offered for a separate charge* where such channels *use only incidental performances of sound recordings*; . . . [and]

        (D) Channels, programming, products and/or other services for which the performance of sound recordings and/or the making of ephemeral recordings is exempt from any license requirement or is separately licensed, including by a statutory license and, for the avoidance of doubt, webcasting, audio services bundled with television programming, interactive services, and transmissions to business establishments.

2007-2012 CRB Decision, 73 Fed. Reg. at 4102 (promulgating 37 C.F.R. § 382.11) (emphasis added).

    19.    During the relevant time period, Sirius XM reported its Gross Revenues to SoundExchange on a monthly basis. Using the royalty rates set forth by the CRB, Sirius XM made payments for each month on the basis of its reported Gross Revenues.

**B. Sirius XM's Unauthorized Exclusions from "Gross Revenues"**

    **1.    Pre-1972 Sound Recordings**

    20.    Sirius XM has taken the position that the federal statutory license does not cover pre-1972 sound recordings, and on information and belief Sirius XM is not separately licensing

the pre-1972 sound recordings from their owners, even though they are subject to common law copyright or equivalent protection under state law.

21. The CRB's regulations provide that Sirius XM's "Gross Revenues" – the revenue base on which Sirius XM's royalty payments are calculated – include all revenue recognized by Sirius XM from the operation of an SDARS, subject only to a limited number of exclusions. None of the regulatory exclusions in effect during the relevant time period permitted Sirius XM to reduce its reported Gross Revenues by an amount purportedly attributable to its performances of pre-1972 sound recordings.

22. As relevant here, the CRB's regulations permitted Sirius XM to exclude "[r]evenues recognized by [Sirius XM] for the provision of," among other things, "[c]hannels, programming, products and/or other services for which the performance of sound recordings and/or the making of Ephemeral Recordings is exempt from any license requirement or is separately licensed, including by a statutory license and, for the avoidance of doubt, webcasting, audio services bundled with television programming, interactive services, and transmissions to business establishments." 37 C.F.R. § 382.11 (paragraph (3) definition of Gross Revenues). The reduction of Gross Revenues purportedly corresponding to Sirius XM's performances of pre-1972 sound recordings did not fall into this category.

23. On information and belief, during the relevant time period Sirius XM did not recognize any revenue for the provision of channels, programming, products and/or services featuring performances of pre-1972 sound recordings. Rather, Sirius XM simply estimated that a certain percentage of its sound recording performances were of pre-1972 sound recordings, and it reduced the Gross Revenues that it reported to SoundExchange by a corresponding percentage. In its recent decision announcing royalty rates and terms for 2013 to 2017, the CRB stated that

Sirius XM did not dispute it had reduced its reported Gross Revenues by between 10% and 15% of its subscription revenue on the theory that it corresponded to performances of pre-1972 sound recordings.  *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services* ("2013-2017 CRB Decision"), 78 Fed. Reg. 23,054, 23,080 (Apr. 17, 2013).

24.     In its decision announcing royalty rates and terms for 2013 to 2017, the CRB confirmed that the regulations in effect between 2007 and 2012 did not permit Sirius XM to exclude revenues purportedly attributable to performances of pre-1972 sound recordings.  The CRB acknowledged that "Sirius XM broadcasts pre-1972 recordings . . . and [between 2007 and 2012 has] . . . exclude[d] a portion of revenues from its Gross Revenues calculation for such use." 78 Fed. Reg. 23,054, 23,074.  The CRB then continued unambiguously that "[t]he current Gross Revenues definition does not expressly recognize such an exclusion, which is not surprising given that there is no revenue recognition for the performance of pre-1972 works." *Id.* at 23,073; *see also id.* at 23,080.  In fact, Sirius XM does not separately recognize any revenues based on the specific types of music programming that Sirius XM plays or on the specific types of music programming to which any particular user listens – which  Sirius XM does not even track.  Because no revenue is separately recognized for the performances of pre-1972 sound recordings, it was unlawful under the unambiguous regulations for Sirius XM to exclude from its Gross Revenues any portion of its domestic subscription revenue that it felt was somehow attributable to performances of pre-1972 sound recordings.  The CRB added that "revenue exclusion *is not* the proper means for addressing pre-1972 recordings. . . .  To be allowable, a deduction must be precise and the methodology transparent." *Id.* at 23,073 (emphasis added).

25. On information and belief, Sirius XM's unauthorized reduction of its reported Gross Revenues by amounts purportedly attributable to performances of pre-1972 sound recordings led it to underpay SoundExchange by tens of millions of dollars.

**2. Sirius XM Premier Package**

26. Beginning at least as early as October 2008, Sirius XM began offering a premium subscription option in addition to its basic package. First marketed to Sirius and XM subscribers as "Best of Sirius" and "Best of XM," the premium packages are now marketed as Sirius XM Premier.

27. Sirius XM Select is Sirius XM's basic satellite radio package, and includes access to over 150 music and talk channels. Prior to a January 2012 price increase, Sirius XM Select was offered for $12.95 a month. That price was raised after January 2012 to $14.49 per month.

28. The Sirius XM Premier package includes all of the music and talk channels encompassed by the Sirius XM Select package. Over and above these channels, the Sirius XM Premier package also includes a number of additional premium all-talk channels. Prior to the January 2012 price increase, Sirius XM Premier was offered for $16.99 a month. That price was raised after January 2012 to $17.99 a month.

29. The extra channels included in Sirius XM Premier are not an add-on offered for a separate charge; rather, Sirius XM charges each subscriber a single undifferentiated amount – $17.99 – for all of the channels included in the Sirius XM Premier package.

30. During the most recent CRB rate-setting proceeding, Sirius XM CFO David Frear testified that, when determining the Gross Revenues reported to SoundExchange as the basis for its royalty payment calculations, Sirius XM excluded $3.50 per month for every Sirius XM Premier subscription. Thus, instead of including the full $17.99 per month for each Sirius XM

Premier subscription, Sirius XM included in Gross Revenues only $14.49 per month for each such subscription. Mr. Frear justified Sirius XM's exclusion of the additional $3.50 increment on the ground that the additional channels included in Sirius XM Premier "don't have any . . . channels involving sound recording performances."

31. Sirius XM's deduction of $3.50 per month for each Sirius XM Premier subscriber directly contravened the CRB's regulations regarding how Gross Revenues are to be calculated. By regulation, Gross Revenues were to include "Subscription revenue recognized by [Sirius XM] directly from residential U.S. Subscribers for [Sirius XM's] SDARS." 37 C.F.R. § 382.11 (definition of Gross Revenues paragraph (1)(i)). The regulations permit Sirius XM to exclude "[r]evenues recognized by [Sirius XM] for the provision of . . . [c]hannels, programming, products and/or other services offered for a separate charge where such channels use only incidental performances of sound recordings." *Id.* at §382.11 (definition of Gross Revenues paragraph (3)(vi)).

32. Sirius XM's exclusion of the price difference between Sirius XM Premier and Sirius XM Select did not comport with the CRB's regulations. The $3.50 difference between the revenue that Sirius XM receives each month from a Sirius XM Premier subscriber, on the one hand, and a Sirius XM Select subscriber, on the other, does not reflect any channel, programming, product, or service "offered for a separate charge." 37 C.F.R. §382.11 (definition of Gross Revenues paragraph (3)(vi)(B)). It is merely the price difference between Sirius XM's basic product and its more expansive product. Nor, on information and belief, does Sirius XM separately recognize revenues attributable to the price difference between Sirius XM Premier and Sirius XM Select.

33.     As with Sirius XM's pre-1972 Gross Revenues reduction, the CRB's recent decision setting royalty rates and terms confirmed that Sirius XM's exclusion of Sirius XM Premier incremental revenue is unauthorized.  The statutory royalty rate was set based on the understanding that it would be applied to a royalty base consisting substantially of subscriber payments for mixed packages of music and non-music programming.  The rate presumably would have been higher if Sirius XM was authorized to allocate its package revenues.  Thus, in discussing when a revenue exclusion is appropriate for non-music packages, the CRB stressed that "the exclusion is available only to the extent that the channels, programming, products and/or other services are offered for a separate charge."  2013-2017 CRB Decision, 78 Fed. Reg. at 23,072 n.45.

34.     Sirius XM's exclusion of $3.50 per month for each Sirius XM Premier subscriber since January 2012 (and its exclusion of $4.04 per month prior to January 2012) has resulted in an underpayment of millions of dollars to SoundExchange during the relevant time period.

**3.      New XM Products**

35.     Prior to the July 2008 merger between Sirius and XM, XM began offering two new products to its subscribers, *Family Friendly* and *Mostly Music*.  Both of these packages continue to be offered by Sirius XM today and, as seen in Sirius XM's advertising, both packages contain numerous channels dedicated solely to the broadcast of sound recordings.

36.     The *Family Friendly* package offers listeners access to most of Sirius XM's music and talk channels, excluding those with an adult theme.  The *Mostly Music* package, as the name suggests, offers access to channels covering "commercial-free music from nearly every genre" in addition to a number of talk channels.

37. As with its other offerings that combine music and talk channels, Sirius XM does not separately recognize the revenue derived from music and non-music channels contained in the *Family Friendly* and *Mostly Music* packages.

38. Sirius XM excluded from Gross Revenues the revenue recognized from subscription packages, including its *Family Friendly* and *Mostly Music* packages, even though these packages contain channels that broadcast recordings covered by the statutory license and do not fall into any of the exclusions identified in the CRB regulations. Sirius XM's unauthorized exclusion of this revenue from Gross Revenues resulted in an underpayment of approximately one million dollars or more to SoundExchange during the relevant time period.

**C. Sirius XM's Non-Payment of Late Fees**

39. In the federal regulations promulgated as part of the 2007-2012 CRB Decision, the Copyright Royalty Judges provided that "a licensee shall pay a late fee of 1.5% per month, or the highest lawful rate, whichever is lower, for any payment and/or statement of account received by [SoundExchange] after the due date. Late fees shall accrue from the due date until payment and statement of account are received by [SoundExchange]." 37 C.F.R. § 382.13(d); *see also* 74 Fed. Reg. 40614, 40616; *See* 37 C.F.R. § 380.4(e); *id.* at § 383.4(a); *id.* at § 384.4(e).

40. For at least the years ending December 31, 2007, 2008, and 2009, Sirius XM and its predecessor entities repeatedly failed to make timely royalty payments and submit timely statements of account to SoundExchange. These untimely submissions were made not only for Sirius XM's satellite radio service, but also for Sirius XM's webcasting service and other platforms. *See* 37 C.F.R. § 380.4(e); *id.* at § 383.4(a); *id.* at § 384.4(e).

41. When those payments were finally made, Sirius XM failed to include the additional late fee payments due to SoundExchange under the regulations. That failure extended

to all of Sirius XM's platforms. SoundExchange is thus owed millions of dollars in late payments from the period 2007 to 2009.

## COUNT ONE

**(Violation of 37 C.F.R § 382.13(a) and 17 U.S.C. § 114(f)(1)(B) – Underpayment Based on Reduction of Revenue Purportedly Corresponding to Use of Pre-1972 Sound Recordings)**

42.     SoundExchange incorporates by reference paragraphs 1 to 41 as if fully set forth herein.

43.     The Copyright Act provides a statutory license for the digital performance rights in sound recordings and the making of ephemeral reproductions to facilitate the licensee's performance of those recordings. 17 U.S.C. §§ 112, 114. Because Sirius XM has chosen to rely on that statutory license, it must make royalty payments to SoundExchange at the rates set by the CRB. 37 C.F.R. § 382.13(a); *see also* 17 U.S.C. § 114(f)(1)(B).

44.     Sirius XM's payments to SoundExchange are calculated as a percentage of Sirius XM's Gross Revenues, a term defined in 37 C.F.R. § 382.11.

45.     From at least January 1, 2007 until December 31, 2012, Sirius XM reduced its reported Gross Revenues by an amount that it deemed attributable to performances of pre-1972 sound recordings. The CRB's regulations did not permit this reduction.

46.     This unauthorized reduction in reported Gross Revenues reduced the amounts that Sirius XM paid to SoundExchange under the terms of the federal statutory license. The unauthorized reduction in reported Gross Revenues, and consequent underpayment, contravened the requirement in the relevant regulations that a "Licensee shall make the royalty payments due under" the regulations to SoundExchange, 37 C.F.R. § 382.13(a), and the Copyright Act's statement that the CRB-determined rates are "binding on . . . entities performing sound recordings" during the period when the rates are in effect. 17 U.S.C. § 114(f)(1)(B).

47.     Sirius XM's improper actions have deprived SoundExchange of millions of dollars of royalties to which SoundExchange was entitled under the CRB's regulations.

## COUNT TWO

### (Violation of 34 C.F.R § 382.13(a) and 17 U.S.C. § 114(f)(1)(B) – Underpayment Based on Partial Exclusion of Revenue From Sirius XM Premier Subscriptions)

48.     Plaintiff incorporates by reference paragraphs 1 to 47 as if set forth herein.

49.     The Copyright Act provides a statutory license for the digital performance rights in sound recordings and the making of ephemeral reproductions to facilitate the licensee's performance of those recordings.  17 U.S.C. §§ 112, 114.  Because Sirius XM has chosen to rely on that statutory license, it must make royalty payments to SoundExchange at the rates set by the CRB.  37 C.F.R. § 382.13(a); *see also* 17 U.S.C. § 114(f)(1)(B).

50.     Sirius XM's payments to SoundExchange are calculated as a percentage of Sirius XM's Gross Revenues, a term defined in 37 C.F.R. § 382.11.

51.     Starting from at least October 2008, Sirius XM excluded from its reported Gross Revenues an amount corresponding to the incremental revenue that it received as a result of subscribers electing its Sirius XM Premier package rather than its standard package.  That exclusion was not authorized by the CRB's regulations.

52.     This unauthorized exclusion reduced the amounts that Sirius XM paid to SoundExchange.  The unauthorized exclusion, and consequent underpayment, contravened the requirement in the relevant regulations that a "Licensee shall make the royalty payments due under" the regulations to SoundExchange, 37 C.F.R. § 382.13(a), and the Copyright Act's statement that the CRB-determined rates are "binding on . . . entities performing sound recordings" during the period when the rates are in effect.  17 U.S.C. § 114(f)(1)(B).

53. Sirius XM's improper actions have deprived SoundExchange of millions of dollars of royalties to which SoundExchange was entitled under the CRB's regulations.

### COUNT THREE

### (Violation of 34 C.F.R § 382.13(a) and 17 U.S.C. § 114(f)(1)(B) – Underpayment Based on Exclusion of Revenue From *Family Friendly* and *Mostly Music* Subscriptions)

54. Plaintiff incorporates by reference paragraphs 1 to 53 as if set forth herein.

55. The Copyright Act provides a statutory license for the digital performance rights in sound recordings and the making of ephemeral reproductions to facilitate the licensee's performance of those recordings. 17 U.S.C. §§ 112, 114. Because Sirius XM has chosen to rely on that statutory license, it must make royalty payments to SoundExchange at rates set by the CRB. 17 U.S.C. § 114(f)(1)(B).

56. Sirius XM's payments to SoundExchange are calculated as a percentage of Sirius XM's Gross Revenues, a term defined in 37 C.F.R. § 382.11.

57. From at least January 1, 2008 until December 31, 2009, Sirius XM excluded from its Gross Revenues the revenues it received from subscriptions to *Family Friendly* and *Mostly Music*. That exclusion was not permitted by the CRB regulations.

58. This unauthorized exclusion reduced the amounts that Sirius XM paid to SoundExchange. The unauthorized exclusion, and consequent underpayment, contravened the requirement in the relevant regulations that a "Licensee shall make the royalty payments due under" the regulations to SoundExchange, 37 C.F.R. § 382.13(a), and the Copyright Act's statement that the CRB-determined rates are "binding on . . . entities performing sound recordings" during the period when the rates are in effect. 17 U.S.C. § 114(f)(1)(B).

59. Sirius XM's improper actions have deprived SoundExchange of approximately one million dollars or more to which SoundExchange was entitled under the CRB's regulations.

## COUNT FOUR

**(Violation of 37 C.F.R. § 382.13(d), 74 Fed. Reg. 40614, 40616, 37 C.F.R. § 383.4(a), and 37 C.F.R. § 384.4(e) – Failure To Make Late Fee Payments)**

60.     Plaintiff incorporates paragraphs 1 to 59 as if set forth herein.

61.     37 C.F.R. § 382.13(d) and related regulations provide that Sirius XM shall pay a late fee of 1.5% per month for any SDARS payment or statement of account that is received by SoundExchange after the due date. Other regulations set for late fees applicable to Sirius XM's other platforms. *See* 37 C.F.R. § 380.4(e); *id.* at § 383.4(a); *id.* at § 384.4(e).

62.     For at least the years ending on December 31, 2007, 2008, and 2009, Sirius XM repeatedly failed to make timely royalty payments or submit timely statements of account to SoundExchange, yet when those payments were finally made it failed to pay the applicable late fees.

63.     Sirius XM's improper failure to pay SoundExchange statutorily mandated late fees have denied SoundExchange millions of dollars to which it is entitled under the CRB's regulations.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, SoundExchange respectfully prays for judgment against Sirius XM as follows:

a.  For compensatory damages not less than $50 million and up to $100 million or more in such amounts to be determined at trial arising from Sirius XM's underpayment of royalties as required by the statutory license;

b.   For appropriate late fees and interest;

  c. For SoundExchange's costs, including reasonable attorney fees and costs and pursuant to 17 U.S.C. § 505; and

  d. For any other relief the Court deems just and proper.

Dated: August 26, 2013        Respectfully submitted,

               /s/ Michael B. DeSanctis

               Michael B. DeSanctis (D.C. Bar #: 460961)
               Joshua M. Segal (D.C. Bar #: 975949)
               Ishan K. Bhabha (D.C. Bar #: 1015673)
               JENNER & BLOCK LLP
               1099 New York Avenue NW Suite 900
               Washington, DC 20001
               (202) 639-6000
               *Counsel for Plaintiff SoundExchange, Inc.*