## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| ) | |
| **SOUNDEXCHANGE, INC.**, ) | |
| 733 10th St., N.W. ) | |
| 10th Floor ) | |
| Washington, DC 20001 ) | **Case No. 1:13 cv 1290 (RJL)** |
| ) | |
| **Plaintiff**, ) | |
| v. ) | |
| ) | |
| **SIRIUS XM RADIO INC.**, ) | |
| 1221 Avenue of the Americas ) | |
| 36th Floor ) | |
| New York, NY 10020 ) | |
| ) | |
| **Defendant**. ) | |
| ) | |

## DEFENDANT SIRIUS XM RADIO INC.'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

R. Bruce Rich (*pro hac vice*)
Todd Larson (*pro hac vice*)
Adam Banks (*pro hac vice pending*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

Peter D. Isakoff (D.C. Bar # 358419)
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW Suite 900
Washington, DC  20005
(202) 682-7000

*Counsel for Sirius XM Radio Inc.*

1

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ............................................................................................3

      A.     The Parties .................................................................................................3

      B.     Statutory Licensing Framework ..............................................................4

      C.     The *Satellite I* Final Determination ..........................................................7

      D.     Sirius XM's Exclusions from Gross Revenues ........................................8

      E.     SoundExchange's Complaint ...................................................................9

ARGUMENT ..............................................................................................................9

      A.     The Doctrine of Primary Jurisdiction....................................................10

      B.     The Questions Presented Require Resolution of Issues Committed to the CRJs' Expertise and Policy Judgment.....................................................11

      C.     The Court Should Refer the Action to the CRB and Dismiss Without Prejudice ................................................................................................16

CONCLUSION..........................................................................................................17

US_ACTIVE:\44338456\14\76061.0013

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*,
  965 F.2d 1118 (D.C. Cir. 1992) ...................................................................... *passim*

*Cmty. for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989) ...................................................................................15

*Fresno Mobile Radio, Inc. v. FCC*,
  165 F.3d 965 (D.C. Cir. 1999) ........................................................................6

*Recording Indus. Ass'n of Am. v. Copyright Royalty Tribunal*,
  662 F.2d 1 (D.C. Cir. 1981) .............................................................................6

*Reiter v. Cooper*,
  507 U.S. 258 (1993) ...............................................................................10, 16

*Ricci v. Chi. Mercantile Exch.*,
  409 U.S. 289 (1973) ..........................................................................10, 11, 13

*Sears, Roebuck & Co. v. Stiffel Co.*,
  376 U.S. 225 (1964) ....................................................................................15

*SoundExchange Inc. v. Librarian of Congress*,
  571 F.3d 1220 (D.C. Cir. 2009) ...............................................................6, 8, 14

*Syntek Semiconductor Co., Ltd. v. Microchip Tech., Inc.*,
  307 F.3d 775 (9th Cir. 2002) ..............................................................3, 11, 15, 16

*United States v. Philip Morris USA, Inc.*,
  686 F.3d 832 (D.C. Cir. 2012) ....................................................................10, 11

*United States v. Western Pacific R.R. Co.*,
  352 U.S. 59 (1956).....................................................................................2, 10

**Statutes**

5 U.S.C. § 706.................................................................................................8

17 U.S.C. § 106.............................................................................................4

17 U.S.C. § 112...........................................................................................3, 4

17 U.S.C. § 114....................................................................................3, 4, 6, 9, 12

ii

17 U.S.C. § 301 ................................................................................................4, 15

17 U.S.C. § 801 .......................................................................................................6

17 U.S.C. § 802 .......................................................................................................4

17 U.S.C. § 803 ...................................................................................5, 6, 7, 8, 16

17 U.S.C. § 804 .......................................................................................................5


## Rules & Regulations

Fed. R. Civ. P. 12(b)(6) ...........................................................................................1

37 C.F.R. § 351 .......................................................................................................5

37 C.F.R. § 380.4 ..............................................................................................3, 9

37 C.F.R. § 382.11 .......................................................................7, 8, 9, 12, 13

37 C.F.R. § 382.12(a) .............................................................................................7

37 C.F.R. § 382.13(d) ............................................................................................9

37 C.F.R. § 384.4(e) ..............................................................................................9

Copyright Office, Review of Copyright Royalty Judges Determination, 74 Fed. Reg. 4537 (Jan. 26, 2009) ..........................................................................................7

Copyright Royalty Board, Mechanical and Digital Phonorecord Delivery Rate Determination Proceeding, 74 Fed. Reg. 6832 (Feb. 11, 2009) ......................................7

Copyirght Royalty Board, Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 78 Fed. Reg. 23054 (Apr. 17, 2013)....13

Copyright Royalty Board, Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 73 Fed. Reg. 4080 (Jan. 24, 2008) (codified at 37 C.F.R. § 382) .......................................................... *passim*


## Legislative History

H.R. Rep. No. 108-408 (2004)...........................................................................4, 14, 15

US_ACTIVE:\44338456\14\76061.0013

Defendant Sirius XM Radio Inc. ("Sirius XM") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

This lawsuit is premised on the unfounded and illogical assertion that Sirius XM should pay royalty fees to Plaintiff SoundExchange, Inc. ("SoundExchange") for the performance of pre-1972 sound recordings and non-music programming *exempt* from the statutory license SoundExchange administers.  This contention has been repeatedly rejected by both the specialized regulatory agency charged with determining the statutory royalty rates—the Copyright Royalty Board ("CRB")—and the United States Court of Appeals for District of Columbia Circuit.  It is no surprise, then, that SoundExchange has chosen to frame its Complaint not to argue that its members actually deserve royalties for performances not covered by the statutory license, but rather as a technical issue—that is, whether Sirius XM has properly interpreted and applied highly detailed and technical regulations written by the CRB setting forth the rates and terms of the statutory license, and in particular whether Sirius XM has properly construed the definition of the term "Gross Revenues"—the baseline used to calculate royalty payments.   The CRB, and not a federal court, is the proper forum to decide in the first instance whether the regulations the CRB itself wrote allow the exemptions Sirius XM has implemented.

As we explain herein, this lawsuit asks the Court to rule on a question that lies squarely within the unique competence of the CRB, the specially qualified body to which Congress delegated the authority to deal with highly technical questions concerning the rates and terms of the statutory license, *see* 17 U.S.C. § 801 *et seq.*  These include how to interpret the definition of Gross Revenues written by the CRB itself and, relatedly, whether Sirius XM's calculation of royalty payments under that definition was proper.  Not only is the CRB the tribunal best situated

to interpret a definition that it wrote, the governing statute expressly provides the CRB with "continuing jurisdiction" to modify or clarify the terms of its own rate determinations to address controversies that arise as parties operate under those determinations, including the dispute reflected in SoundExchange's Complaint.

It is precisely in such circumstances as these that district courts routinely dismiss or stay claims under the doctrine of "primary jurisdiction."  That doctrine permits a court to "refer" actions to an administrative agency when the core questions raised in a lawsuit "require[] the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."  *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 64 (1956).   The purpose of the doctrine, courts have emphasized, is to utilize "the advantages of allowing an agency to apply its expert judgment" including weighing "the policy judgments needed to implement an agency's mandate."  *Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1120 (D.C. Cir. 1992).

The questions presented here fall squarely within the scope and purposes of the primary jurisdiction doctrine, *i.e.*, whether Sirius XM's exclusion of revenues associated with pre-1972 sound recordings and non-music programming—both exempt from the statutory license—was a correct application of the definition of "Gross Revenues" within the meaning of the CRB's rate determination.   Answering those questions requires an understanding of the proper interpretation and application of the CRB's own regulations—regulations formulated after detailed evidentiary and expert submissions by Sirius XM and SoundExchange, and multi-week hearings before the Copyright Royalty Judges—questions the CRB is undoubtedly in the best position to answer. Moreover, the questions directly implicate the technical and policy expertise Congress has expressly delegated to the CRB.   Finally, because the questions at issue implicate the copyright

2

law, an area where Congress has promoted national uniformity, *see, e.g.*, *Syntek Semiconductor Co., Ltd. v. Microchip Tech., Inc.*, 307 F.3d 775, 781 (9th Cir. 2002), the agency itself, rather than the several federal district courts, should have the first opportunity to clarify their meaning. Accordingly, the case should be dismissed or stayed under the doctrine of primary jurisdiction.

## STATEMENT OF FACTS

### A.     The Parties

Plaintiff SoundExchange, originally organized as an arm of the Recording Industry Association of America, is a Delaware nonprofit organization designated by CRB as the sole entity in the United States to collect digital performance royalties from services operating under the statutory licenses provided for at 17 U.S.C. §§ 112 & 114.  Compl. ¶ 10.  Pursuant to its authority under the governing regulations, *see, e.g.*, 37 C.F.R. § 380.4, SoundExchange collects statutory royalties from, *inter alia*, providers of satellite radio, Internet radio services and cable TV music channels, and distributes those royalties to artists and record companies.  *See* Compl. ¶ 10.

Defendant Sirius XM is a Delaware corporation with its principal place of business in New York City.  Sirius XM also has offices in Washington, D.C. and elsewhere.  Sirius XM operates a satellite digital audio radio service ("SDARS") broadcasting more than 135 channels of music, sports, news, talk, comedy, entertainment, traffic and weather to over 25 million subscribers.  Although many of Sirius XM's channels are devoted to commercial-free music, roughly half of Sirius XM's programming consists of non-music programming, including, *inter alia*, the well-known Howard Stern show, numerous news, political and other talk-radio channels, and extensive college and professional sports programming.  This non-music programming is not subject to the statutory license administered by SoundExchange.   And on some of its music channels, Sirius XM broadcasts sound recordings created before February 15,

1972, which are not federally copyrightable, and likewise not covered by the Section 112/114 statutory license.  *See* 17 U.S.C. § 301(c).

> ### B.      Statutory Licensing Framework

Section 106 of the Copyright Act, 17 U.S.C. § 106(6), grants record companies and their artists the right to be compensated under U.S. copyright law for public performances of their federally copyrighted sound recordings performed by means of a digital audio transmission.  At the same time, the Copyright Act also provides for a compulsory licensing mechanism that enables users like Sirius XM to obtain a "statutory license" to cover the prescribed performances of sound recordings and to transmit them by way of a digital audio service, like Sirius XM's.  *See* 17 U.S.C. §§ 112(e); 114(d)(2).  If a user and a copyright owner are unable to agree to royalty rates and terms, as happened here, the Copyright Act provides that the CRB—an agency consisting of three Copyright Royalty Judges ("CRJs") appointed by the Librarian of Congress— shall set "reasonable rates and terms of royalty payments."  *See* 17 U.S.C. § 114(f).

The CRJs are appointed for staggered six-year terms.  17 U.S.C. § 802(c).  In order to ensure that the CRJs bring to bear sufficient relevant experience, the Copyright Act specifies certain required qualifications.  Each CRJ must be an attorney with at least seven years' experience; in addition, the chief CRJ must have five years' experience in adjudications, arbitrations or court trials.  One of the remaining CRJs must have significant knowledge of copyright law; the other remaining CRJ must have significant knowledge of economics.  *See* 17 U.S.C. § 802(a)(1).  As the legislative history suggests, these highly specific qualifications ensure that the CRJs have the requisite "mastery of economics and marketplace factors as well as considerable knowledge of copyright law,"  H.R. Rep. No. 108-408, at 25 (2004), and reflect an intent to commit questions arising under the statutory license provisions to this specialized tribunal.

The CRB sets the rates and terms for the statutory licenses for license periods lasting five or six years;[1] it does so by adjudicating adversarial proceedings—essentially live trials—between the affected parties (typically SoundExchange and the services in the particular license category). 17 U.S.C. § 803(b); 37 C.F.R. § 351.  In the course of such proceedings, the CRJs take written direct and rebuttal statements from the participants, supervise comprehensive discovery between the parties, and hear live testimony from witnesses, including economic and technical experts.  In the proceeding at issue here, which took place between January 2006 and January 2008, the CRJs considered written direct and rebuttal statements, heard twenty-six days of testimony from 39 witnesses filling over 7,700 transcript pages, admitted more than 230 exhibits, and amassed a docket of over 400 pleadings, motions and orders.  *See* Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services (the "*Satellite I Final Determination*"), 73 Fed. Reg. 4080, 4080–81 (Jan. 24, 2008) (codified at 37 C.F.R. § 382) (detailing the record evidence on which the determination was made).

To make the determination of reasonable rates and terms of royalty payments, the Copyright Act directs the CRJs to consider and balance four objectives:

- "To maximize the availability of creative works to the public";

- "To afford the copyright owner a fair return for his or her creative work and the copyright user a fair income under existing economic conditions";

- "To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication"; and

---

[1] For the first such proceeding involving preexisting satellite digital audio radio services, the services at issue here, the Copyright Act provided for a six-year period beginning January 1, 2007 and ending December 31, 2012.  *See* 17 U.S.C. § 804(b)(3)(B).  Thereafter, the Act provides for five-year terms.  *Id.*  It is the initial license period that is at issue in this case.

5

- "To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices."

17 U.S.C. § 801(b)(1)(A)–(D).  Congress granted the CRJs considerable "legislative discretion" in applying their expert knowledge of the industry and the prevailing economics to balance these statutory factors appropriately to determine reasonable copyright policy.  *See SoundExchange Inc. v. Librarian of Congress*, 571 F.3d 1220, 1223–24 (D.C. Cir. 2009) (quoting *Recording Indus. Ass'n of Am. v. Copyright Royalty Tribunal*, 662 F.2d 1, 9 (D.C. Cir. 1981)) (affirming in part and remanding in part the CRJs' final determination on petition for review from agency's decision under the Administrative Procedures Act).  This substantial latitude in balancing the factors is warranted, courts have held, "because the four objectives [the CRJs] must pursue point in different directions, requiring the agency first to predict the future course of the music industry and then to work an equitable division of projected music industry profits."  *SoundExchange*, 571 F.3d at 1225.

Within a given statutory license category, the determination of the CRJs is "binding on all copyright owners of sound recordings and entities performing sound recordings."  17 U.S.C. § 114(f)(1)(B).  The CRJs' final determination is reviewable under the Administrative Procedures Act by the D.C. Circuit.  *See* 17 U.S.C. § 803(d).  This review, as is typical under the APA, is extremely limited and deferential.  The D.C. Circuit grants "substantial deference" to the CRJs' determination, with "judicial review [ ] limited to determining whether the agency's decision reasonably advances at least one of those objectives."  *SoundExchange*, 571 F.3d at 1224, 1225 (quoting *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999)).

In addition, the Copyright Act expressly grants the CRJs "continuing jurisdiction" to "issue an amendment to a written determination to correct any technical or clerical errors in the determination or to modify the terms, but not the rates, of royalty payments in response to

6

unforeseen circumstances that would frustrate the proper implementation" of the final

determination.  17 U.S.C. § 803(c)(4).[2]

     **C.**      **The *Satellite I* Final Determination**

On January 9, 2006, the CRB commenced the proceeding to determine the royalty rates

and terms for the statutory license for preexisting satellite digital audio radio services

("SDARS") for the period 2007 through 2012 (the "*Satellite I* Proceeding"), the period at issue

here.  The CRJs issued their final determination on January 24, 2008.  *See Satellite I* Final

Determination, 73 Fed. Reg. at 4080.  Under the determination, the royalty fees for an SDARS,

like Sirius XM, was 6% of Gross Revenues (as defined in the determination) for 2007 and 2008;

6.5% of Gross Revenues for 2009; 7.0% of Gross Revenues for 2010; 7.5% of Gross Revenues

for 2011; and 8.0% of Gross Revenues for 2012.  73 Fed. Reg. 4084; *see also* 37 C.F.R. §

382.12(a).

The CRJs determined that for purposes of calculating the applicable royalty payment, the

term Gross Revenues would generally include the user's subscription and advertising revenue.

*See* 73 Fed. Reg. 4102; 37 C.F.R. § 382.11.  But the CRJs expressly *excluded* certain items from

the calculation of Gross Revenues, including, as relevant here, "[r]evenues recognized by [the]

Licensee for the provision of":

- "Channels, programming, products and/or other services offered for a separate
  charge where such channels use only incidental performances of sound
  recordings"; and

---

[2] The CRJs and the Register of Copyrights take a broad view of the CRJs' authority to exercise
continuing jurisdiction to amend a rate determination.  For example, continuing jurisdiction has
been exercised to modify the definition of an "interactive stream" so as more closely to comport
with copyright law.  *See, e.g.*, Copyright Office, Review of Copyright Royalty Judges
Determination, 74 Fed. Reg. 4537, 4543 (Jan. 26, 2009); Copyright Royalty Board, Mechanical
and Digital Phonorecord Delivery Rate Determination Proceeding, 74 Fed. Reg. 6832, 6833
(Feb. 11, 2009).

US_ACTIVE:\44338456\14\76061.0013

- "Channels, programming, products and/or other services for which the performance of sound recordings and/or the making of ephemeral recordings is exempt from any license requirement or is separately licensed, including by a statutory license."

73 Fed. Reg. 4102; 37 C.F.R. § 382.11(3)(vi)(B) & (D).  These exclusions from Gross Revenues, the CRJs explained, reflected their effort to "clearly delineate the revenues related to the value of the sound recording performance rights at issue in this proceeding."  *Satellite I* Final Determination, 73 Fed. Reg. at 4087.  Put simply, the CRJs recognized that there is no reason for a user like Sirius XM to have to pay royalties on revenue earned for activities not covered by the statutory license, and set the royalty rates with these Gross Revenues ground rules in mind.  The D.C. Circuit, considering SoundExchange's petition for review from the CRJs' final determination, agreed: "SoundExchange never contended, and the CRJ[s] never opined that revenue from such non-music sources should be included in calculating the royalty payments."  *SoundExchange*, 517 F.3d at 1225.[3]

**D.      Sirius XM's Exclusions from Gross Revenues**

Pursuant to its understanding of the CRJs' ruling, Sirius XM excluded revenues associated with certain of its programming from its calculation of Gross Revenues during the 2007-2012 license period.  As relevant to this motion, these exclusions fall into two general categories:

- *Pre-1972 sound recordings*.  Sirius XM excludes revenues attributable to the performance of sound recordings created before February 15, 1972, because these

---

[3] SoundExchange appealed the CRJs' final determination in *Satellite I* to the D.C. Circuit on grounds other than those at issue here.  That appeal was filed pursuant to 17 U.S.C. § 803(d), which calls for appeals court review of CRJ determinations issued under § 803(c) and specifies that the review be conducted under the Administrative Procedures Act, 5 U.S.C. § 706.  Appellate review of CRJ determinations by the Court of Appeals would also appear to include *amendments* to such determinations issued under the CRJs grant of continuing jurisdiction, as that paragraph granting such continuing jurisdiction to the CRJs is included in the same section (803(c)) as that providing for the initial determination.

US_ACTIVE:\44338456\14\76061.0013

sound recordings are not copyrightable under federal copyright law and therefore not covered by the Section 114 statutory license for which Sirius XM pays SoundExchange.  Thus, such revenues fall within the revenue exclusion for sound recordings "exempt from any license requirement."  73 Fed. Reg. 4102; 37 C.F.R. § 382.11(3)(vi)(D); and

- *Sirius XM Premier Packages*.  Sirius XM excludes incremental subscription fees for upgrades to its premier subscription package because the programming obtained when users upgrade  includes all-talk or other non-music content that makes only "incidental" use of covered sound recordings.  *See* 73 Fed. Reg. 4102; 37 C.F.R. § 382.11(3)(vi)(B).[4]

### E.      SoundExchange's Complaint

On August 26, 2013, SoundExchange filed this Complaint purporting to seek relief under Section 114(f)(1)(B) of the Copyright Act (and the corresponding CRB regulations) for Sirius XM's alleged underpayment pursuant to the terms of the statutory license.  Specifically, SoundExchange alleges that Sirius XM wrongly excluded from Gross Revenues monies attributable Pre-1972 sound recordings (Count I), Sirius XM's Premier offerings (Count II), and Sirius XM's Family Friendly and Mostly Music subscriptions (Count III).  In addition, SoundExchange alleges that Sirius XM failed to make certain late payments it purportedly owed under 37 C.F.R. §§ 380.4(e), 382.13(d) & 384.4(e) (Count IV).

### ARGUMENT

**The Court Should Refer this Action to the CRB under the Doctrine of Primary Jurisdiction**

SoundExchange's Complaint should be dismissed (or held in abeyance) under the doctrine of primary jurisdiction.

---

[4] As noted below, the Complaint also asserts two claims based on Sirius XM's exclusion of revenue associated with its Family Friendly and Mostly Music subscription packages, and alleges the failure to make certain late payments.  These claims are small in size compared with the claims relating to the pre-1972 sound recordings and the Sirius XM premier packages.  Nonetheless, to the extent that the doctrine of primary jurisdiction counsels this Court's deference to the CRB on the principal issues in this case, it counsels deference on these less significant issues as well.

9

A.        The Doctrine of Primary Jurisdiction

The primary jurisdiction doctrine permits a court to "suspend" the judicial process "pending referral" of issues to an administrative agency when the core questions before it "require[] the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Western Pacific*, 352 U.S. at 64.  Courts have recognized that an administrative agency may be "best suited to make the initial decision on the issues in dispute," when Congress has entrusted an agency with special competence over the matter. *Allnet*, 965 F.2d at 1120.  Courts have held that the primary jurisdiction doctrine is particularly applicable to "matters that should be dealt with in the first instance by those especially familiar with the customs and practices of the industry and of the unique market-place involved." *Ricci v. Chi. Mercantile Exch.*, 409 U.S. 289, 305 (1973).   Applying the doctrine "requires the court to enable a 'referral' to the agency staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993).

Courts evaluating whether to refer a question to an agency under the primary jurisdiction doctrine have typically considered "the advantages of allowing an agency to apply its expert judgment . . . Expertise, of course, is not merely technical but extends to the policy judgments needed to implement an agency's mandate." *Allnet,* 965 F.2d  at 1120 (internal citation omitted); *see also United States v. Philip Morris USA, Inc.*, 686 F.3d 832, 837 (D.C. Cir. 2012) (identifying the applicable factors).  In addition, courts have considered the extent to which the issue in question involves "a concern for uniform outcomes (which may be defeated if disparate courts resolve regulatory issues inconsistently)." *Allnet*, 965 F.2d at 1120.  In the end, as the D.C. Circuit has concluded, "we have found the primary jurisdiction doctrine applicable when

10

the precise question before the district court was one within the particular competence of an

agency." *Philip Morris*, 686 F.3d at 837.

This case presents a prime candidate for referral to the CRB under the primary

jurisdiction doctrine.  Most critically, the precise question involved here falls squarely within the

special competence of the CRB and the policy judgments Congress has entrusted the Board with

determining.  The core questions here concern the proper interpretation and application of a

definition authored by the CRJs themselves—and one that reflects the Judges' own effort to

apply the guiding Section 801(b) policy factors to a massive evidentiary record developed over

the course of a multi-week trial between the parties.  *See Allnet*, 965 F.2d at 1120.  The CRJs

should have the opportunity to interpret and clarify the meaning of their own regulation in the

first instance.  *See id.* at 1123 (primary jurisdiction appropriate where question involves "the

Commission's interpretation of its own regulations, on which it is owed great deference").

Finally, courts have concluded that primary jurisdiction referral is especially appropriate where,

as here, the questions presented implicate the Copyright Act, an area where concerns for national

uniformity are paramount.  *See Syntek*, 307 F.3d at 781.

**B.      The Questions Presented Require Resolution of Issues Committed to the
         CRJs' Expertise and Policy Judgment**

As the Supreme Court has emphasized, referral under the primary jurisdiction doctrine is

particularly appropriate where the action implicates "matters that should be dealt with in the first

instance by those especially familiar with the customs and practices of the industry and of the

unique market-place involved . . . . matters typically lying at the heart of an administrative

agency's task." *Ricci*, 409 U.S. at 305 (internal citations omitted).  The precise issues presented

in this action fall squarely within the realm of issues Congress committed to the CRB for the

US_ACTIVE\44338456\14\76061.0013

CRB to apply its expertise and policy judgment to determine "reasonable rates and terms of royalty payments." 17 U.S.C. § 114(f).

Specifically, the Complaint raises technical questions, not about the interpretation of a particular provision of the copyright law, but about the proper construction and application of the CRJs' own final determination setting the rates and terms of the 2007-2012 statutory license. For example, Count I of the Complaint alleges that Sirius XM improperly excludes from "Gross Revenues"—the baseline on which the royalty payment is calculated—revenues associated with pre-1972 sound recordings. Because, as noted, sound recordings created before February 15, 1972 are not subject to the statutory license, Sirius XM excludes revenues associated with such sound recordings under the provision of the final determination that permits revenue deductions for programming "exempt from any license requirement." 73 Fed. Reg. 4102; 37 C.F.R. § 382.11(definition of the term "Gross Revenues" in paragraph (3)(vi)(D)). SoundExchange contends that the definition covering the 2007-2012 rate period did not permit Sirius XM's deduction. *See* Compl. ¶ 45. Accordingly, whether Sirius XM properly construed the CRJs' final determination and appropriately computed its royalty obligation during the 2007-2012 rate period by accounting for the exempt nature of performances of pre-1972 sound recordings are questions that essentially ask what the CRJs meant when they defined the exclusion from the term "Gross Revenues" that is at issue. The CRJs should have the opportunity to address that question in the first instance; indeed, they are perhaps the only ones who could supply an informed and authoritative response.[5]

---

[5] When the issue of allowing a deduction from royalties for pre-72 recordings was placed squarely before them in the recent *Satellite II* proceeding, the CRJs did not hesitate in holding that "pre-1972 recordings are not licensed under the statutory royalty regime and should not factor into determining the statutory royalty obligation" and, at the urging of the parties, clarified the mechanism for reducing Sirius XM's royalty payment on account of pre-72 performances.

US_ACTIVE:\44338456\14\76061.0013

Similarly, Count II of the Complaint mounts a technical challenge to Sirius XM's Gross Revenues exclusion for programming that makes only "incidental" use of covered sound recordings.   As noted, the CRJs' final determination excludes from Gross Revenues those revenues associated with "channels, programming, products and/or other services offered for a separate charge where such channels use only incidental performances of sound recordings."  73 Fed. Reg. 4102; 37 C.F.R. § 382.11 ("Gross Revenues" paragraph (3)(vi)(B)).  During the 2007-2012 license period, Sirius XM excluded incremental revenues it earned when its subscribers upgraded from its "Select" to its "Premier" Package because the incremental difference is directly and solely attributable to additional offerings available in the Premier Package that are exempt from the statutory license, *i.e.*, that contain talk and other non-music programming that makes only incidental, if any, use of covered sound recordings.  SoundExchange challenges as improper Sirius XM's exclusion of the upcharge as within the meaning of the Gross Revenues exclusion.  *See* Compl. ¶¶ 52, 58.  Again, this question goes directly to what the CRJs intended when they drafted the Gross Revenues definition and the exclusion for non-music programming.

It is clear that these technical questions about the construction and application of the CRJs' Gross Revenues definition fall squarely within the expertise of the CRJs as the body "especially familiar with the customs and practices of the industry and of the unique market-place involved." *Ricci*, 409 U.S. at 305.  As the D.C. Circuit has explained in connection with SoundExchange's earlier appeal of the CRJs' *Satellite I* determination, *see* n.3, *supra*, Congress delegated to the CRJs "legislative discretion" to determine the reasonable royalty rates and terms and to use their expertise and policy judgment in balancing the specified statutory factors:

---

Copyright Royalty Board, Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 78 Fed. Reg. 23054, 23073 (Apr. 17, 2013) (governing the 2013-2017 rate period).

> First, the agency is required to estimate the effect of the royalty rate on the future of the music industry, which requires a forecast of the direction in which the future public interest lies based on the expert knowledge of the agency.  Second, the agency has legislative discretion in determining copyright policy in order to achieve an equitable division of music industry profits between the copyright owners and users.  Finally, the statutory factors pull in opposite directions, and reconciliation of these objectives is committed to the agency as part of its mandate to determine reasonable royalty rates.

*SoundExchange*, 571 F.3d at 1223–24 (internal citations, quotation marks and alterations

omitted).  The CRJs' final determination and the proper interpretation of that determination

necessarily both engage the CRJs' expertise and weighing of policy factors; such "expertise, of

course, is not merely technical but extends to the policy judgments needed to implement an

agency's mandate."  *Allnet*, 965 F.2d at 1120.  How the terms should be constructed so as to

exclude revenue earned on account of exempt pre-72 recordings and non-music programming is

precisely such a "policy judgment."  Because Congress has delegated the questions at issue here

to the CRB, giving the CRB the opportunity to decide them in the first instance is not only more

efficient, but true to Congress's design.

   That Congress expressly committed questions as to the detailed implementation of the

statutory license to the CRB is confirmed by the legislative history to the Copyright Royalty and

Distribution Reform Act of 2004.  That Act replaced the prior "CARP" regime—a panel of lay

arbitrators convened on an ad hoc basis—with the CRB, a full-time board of expert judges

appointed for a specified term of years to gain and exploit their experience and exposure to the

regulated industries.  Critics of the prior system, Congress observed, argued that the arbitrators'

decisions were "unpredictable and inconsistent" and that the "[a]rbitrators lack[ed] appropriate

expertise to render decisions."  H.R. Rep. No. 108-408, at 18 (2004); *see also id.* at 25

("[A]rbitrators selected under the current CARP system do not have the training, education, or

experience in [the] relevant subject matter.").  By comparison, the CRB—composed of experts

trained in the relevant fields—was designed to address the "concern that the evidence presented in the determination of a rate necessitates a significant mastery of economics and marketplace factors as well as considerable knowledge of copyright law."  *Id.*  Congress designed the CRB to ensure that it had the relevant expertise to properly address the rate-setting issues committed to it.

Finally, this action presents circumstances analogous to other cases where courts have referred questions to agencies on primary jurisdiction grounds.  In *Allnet*, for example, the D.C. Circuit referred a question of tariff application and construction to the FCC, the agency responsible for its implementation and regulation.  *See Allnet*, 965 F.2d at 1120 ("[I]t is hardly surprising that courts have frequently invoked primary jurisdiction in cases involving tariff interpretations—an issue closely related to the central issues here, compliance of a tariff with regulatory standards and the consequences of imperfect compliance."); *see also Syntek*, 307 F.3d at 781(referring a question to the Register of Copyrights where the "resolution of the question at hand requires an analysis of whether the agency acted in conformance with its own regulations").

In sum, because "this case requires the resolution of an issue within the jurisdiction of an administrative body exercising statutory and comprehensive regulatory authority over a national activity that requires expertise and uniformity in administration,"  *Syntek*, 307 F.3d at 782,[6]  the court should refer the matter to the CRJs under the primary jurisdiction doctrine.

---

[6] "Congressional intent to have national uniformity in copyright laws is clear."  *Syntek*, 307 F.3d at 781 (citing *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 n.7 (1964) and 17 U.S.C. § 301 and referring the case under primary jurisdiction); *see also Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) (Congress enacted the Copyright Act with the "express objective of creating national, uniform copyright law.").  For just this reason, section 301 of the Copyright Act generally provides for the preemption of federal copyright law over state law.  The need for national uniformity is no less acute with respect to the interpretations of the CRJs' regulations, as inconsistent constructions of the CRJs' regulations by district courts across the country could destabilize the regulated entities and industries.  Referral to the CRJs to

### C.   The Court Should Refer the Action to the CRB and Dismiss Without Prejudice

A court referring a case to an agency under primary jurisdiction grounds either stays the proceedings or dismisses the action without prejudice. *See Reiter*, 507 U.S. at 268. "Normally, if the court concludes that the dispute which forms the basis of the action is within the agency's primary jurisdiction, the case should be dismissed without prejudice so that the parties may pursue their administrative remedies." *Syntek*, 307 F.3d at 782. Only if the parties will be prejudiced by a dismissal do courts stay or otherwise hold the lawsuit in abeyance pending the resolution of the agency proceedings. *Id.*; *see also Allnet*, 965 F.2d at 1123 ("We can discern no present prejudice to either party from dismissal."). SoundExchange cannot show any prejudice from a dismissal here.

Finally, as to the mechanics of the referral, a "referral" of the matter to the agency does not involve a formal "transfer" of the action the CRB. Rather, the court dismisses without prejudice or stays the action and the parties must initiate appropriate proceedings before the agency. *See Syntek*, 307 F.3d at 782 n.3; *see also Reiter*, 507 U.S. at 269 n.3 (stating that the proper procedure is for the district court to stay or dismiss "to give the plaintiff a reasonable opportunity within which to apply to [the relevant agency] for a ruling"). Here, SoundExchange would initiate proper proceedings before the agency, utilizing the CRJs' "continuing jurisdiction" to amend the determination to make technical corrections and resolve unforeseen questions concerning their final determination. *See* 17 U.S.C. § 803(c)(4).[7]

---

determine in the first instance the proper construction and application of their own regulations would further the Congressional intent to maintain uniform national copyright laws.

[7] Sirius XM hereby preserves, and does not by this motion waive, all additional and affirmative defenses it has available to it, including but not limited to laches and the statute of limitations.

US_ACTIVE:\44338456\14\76061.0013

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint without prejudice or stay the action under the doctrine of primary jurisdiction.

Dated: October 16, 2013                              Respectfully submitted,


                                                      /s/ *Peter D. Isakoff*
                                                     Peter D. Isakoff (D.C. Bar No. 358419)
                                                     WEIL, GOTSHAL & MANGES LLP
                                                     1300 Eye Street, NW  Suite 900
                                                     Washington, D.C., 20005
                                                     Telephone:  (202) 682-7000
                                                     Facsimile:  (202) 857-0940
                                                     peter.isakoff@weil.com

                                                     R. Bruce Rich (*pro hac vice*)
                                                     Todd Larson (*pro hac vice*)
                                                     Adam Banks (*pro hac vice pending*)
                                                     WEIL, GOTSHAL & MANGES LLP
                                                     767 Fifth Avenue
                                                     New York, NY 10153
                                                     Telephone:  (212) 310-8000
                                                     Facsimile:  (212) 310-8007
                                                     bruce.rich@weil.com
                                                     todd.larson@weil.com
                                                     adam.banks@weil.com


                                                     *Counsel for Sirius XM Radio Inc.*

17