**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SOUNDEXCHANGE, INC.

                    Plaintiff,

v.                                                    **Civil Action No. 1:13-cv-1290 (RJL)**

SIRIUS XM RADIO INC.

                    Defendant.

---

**PLAINTIFF SOUNDEXCHANGE'S MEMORANDUM OF
POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT SIRIUS XM'S MOTION TO DISMISS**

Michael B. DeSanctis (D.C. Bar #: 460961)
Joshua M. Segal (D.C. Bar #: 975949)
Ishan K. Bhabha (D.C. Bar #: 1015673)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, D.C. 20001
(202) 639-6000

*Counsel for SoundExchange, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

   A.  The Statutory Framework for the Licensing of Digital Performance Rights .............. 2

   B.  The CRB's Regulations Governing Sirius XM's Statutory License ........................... 3

   C.  SoundExchange's Lawsuit Against Sirius XM ................................................... 4

       1.  Exclusion of Revenues Supposedly Attributable to Pre-1972 Sound Recordings .... 4

       2.  Exclusion of Revenues Associated With Sirius XM Premier Subscriptions ............. 5

ARGUMENT ...................................................................................................................... 7

I.  THE DOCTRINE OF PRIMARY JURISDICTION DOES NOT APPLY WHERE
   GOVERNING REGULATIONS ARE UNAMBIGUOUS AND ALREADY HAVE
   BEEN INTERPRETED AND APPLIED BY THE AGENCY THAT ISSUED THEM .... 8

II.  NONE OF THE TRADITIONAL GROUNDS FOR INVOKING THE DOCTRINE OF
   PRIMARY JURISDICTION EXISTS HERE ................................................................ 11

   A.  This Case Does Not Involve a Question of Policy or The Application Of Agency
      Expertise, But Rather The Interpretation Of Existing Regulations ........................... 12

   B.  A Decision By This Court Poses No Risk To Uniform Application Of The Law ....... 14

   C.  It Is Not Clear That The CRB Is Authorized To Hear SoundExchange's Claims Or
      Grant The Relief Requested .......................................................................... 16

CONCLUSION .................................................................................................................. 18

# TABLE OF AUTHORITIES

Page(s)

CASES

*Allied Air Freight, Inc. v. Pan Am. World Airways, Inc.*,
    393 F.2d 441 (2d Cir. 1968)............................................................................12, 16

*Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n*,
    965 F.2d 1118 (D.C. Cir. 1992) .....................................................................11

*American Ass'n. of Cruise Passengers v. Cunard Cruise Line, Ltd.*,
    31 F.3d 1184 (D.C. Cir. 1994) .......................................................................17

*Atchiston, T. & S. F. Rwy. Co. v. Wichita Bd. of Trade*,
    412 U.S. 800 (1973)........................................................................................12

*Carnation Co. v. Pac. Westbound Conference*,
    383 U.S. 213 (1966)........................................................................................14

*Charvat v. EchoStar Satellite, LLC*,
    630 F.3d 459 (6th Cir. 2010) ..........................................................................15

*Ciralsky v. CIA*,
    355 F.3d 661 (D.C. Cir. 2004) ........................................................................17

*Civil Aeronautics Board v. Modern Air Transp., Inc.*,
    179 F.2d 622 (2d Cir. 1950)............................................................................12

*Dimondstein v. Am. Postal Workers Union*,
    Civ. A. No. 13-1228, – F. Supp. 2d. – , 2013 WL 4578306 (D.D.C. Aug. 29, 2013) .............13

*Dreisbach v. Murphy*,
    658 F.2d 720 (9th Cir. 1981) ..........................................................................13

*Ellis v. Tribune Television Co.*,
    443 F.3d 71 (2d Cir. 2006)..............................................................................12

*Etheridge v. FedChoice Fed. Credit Union*,
    789 F. Supp. 2d 27 (D.D.C. 2011) ..................................................................13

*Far East Conference v. United States*,
    342 U.S. 570 ...................................................................................................15

*Farley Transp. Co., v. Santa Fe Trail Transp. Co.*,
    778 F.2d 1365 (9th Cir. 1985) ..........................................................................8

*Handy v. Shaw, Bransford, Veilleux & Roth*,
    325 F.3d 346 (D.C. Cir. 2003) ..........................................................................7

*Israel v. Baxter Laboratories., Inc.*,
    466 F.2d 272 (D.C. Cir. 1972) .................................................................................11

*Kappelmann v. Delta Air Lines, Inc.*,
    539 F.2d 165 (D.C. Cir. 1976) ...........................................................................11, 12

*Lee v. Hartford Life & Acc. Ins. Co.*,
    928 F. Supp. 2d 51 (D.D.C. 2013) .......................................................................13

*Litton Sys. Inc. v. Sw. Bell Tel. Co.*,
    539 F.2d 418 (5th Cir. 1976) ...............................................................................14

*Local Union No. 189, v. Jewel Tea Co.*,
    381 U.S. 676 (1965) ..............................................................................................16

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    496 F.2d 214 (3d Cir. 1974) .................................................................................11

*Montana-Dakota Utils Co. v. Nw. Pub. Serv. Co.*,
    341 U.S. 246 (1951) ..............................................................................................16

*Nader v. Allegheny Airlines, Inc.*,
    426 U.S. 290 (1976) ..............................................................................................12

*Ryan v. Chemlawn Corp.*,
    935 F.2d 129 (7th Cir. 1991) ...............................................................................16

*United States v. Elrod*,
    627 F.2d 813 (7th Cir. 1980) ...............................................................................16

*\*United States v. Phillip Morris USA Inc.*,
    686 F.3d 832 (D.C. Cir. 2012) ...........................................................................8, 14

*\*United States v. W. Pac. R.R. Co.*,
    352 U.S. 59 (1956) .............................................................................................8, 11

*Vahey v. Gen. Motors Corp.*,
    Civ. A. No. 11-661 ................................................................................................13

*Wagner & Brown v. ANR Pipeline Co.*,
    837 F.2d 199 (5th Cir. 1988) ...............................................................................15

*Williamson v. Cox*,
    No. Civ. A. 12-0712, – F. Supp. 2d – , 2013 WL 3388609 (D.D.C. July 9, 2013) ................13

STATUTES

17 U.S.C. § 106(6) .......................................................................................................2

17 U.S.C. § 112 ..................................................................................................................2

17 U.S.C. § 114(d)(2) .........................................................................................................2

17 U.S.C. § 114(f)(1)(A) .....................................................................................................2

17 U.S.C. § 114(g)(2)(A)-(D) .............................................................................................3

17 U.S.C. § 114(j)(10) .......................................................................................................15

17 U.S.C. § 301(c) ..............................................................................................................4

17 U.S.C. § 803(c)(4) ........................................................................................................17

OTHER AUTHORITIES

37 C.F.R. § 382.11 .........................................................................................................3, 13

*37 C.F.R. § 382.11(1) ........................................................................................................8

*37 C.F.R. § 382.11(vi)(B) .........................................................................................6, 9, 10

*37 C.F.R. § 382.11(vi)(D) ..................................................................................................9

*Determination of Rates and Terms for Preexisting Subscription Services and Satellite
   Digital Audio Radio Services, 73 Fed. Reg. 4080, 4099 (Jan. 24, 2008) ("2007-2012
   CRB Decision") ...................................................................................................3, 4, 6

*Determination of Rates and Terms for Preexisting Subscription Services and Satellite
   Digital Audio Radio Services, 78 Fed. Reg. 23,054, 23,096 (Apr. 17, 2013) ("2013-
   2017 CRB Decision") .................................................................................3, 5, 6, 10, 15

**INTRODUCTION**

The doctrine of primary jurisdiction could not be less relevant here, and has no application to the claims at issue. Accordingly, Sirius XM's motion to dismiss should be denied out of hand.

Between 2007 and 2012, Sirius XM underpaid SoundExchange by tens of millions of dollars in license fees that it owed pursuant to regulations promulgated by the Copyright Royalty Judges ("CRJs") that make up the federal Copyright Royalty Board ("CRB").[1] Those regulations required Sirius XM to pay SoundExchange a royalty for Sirius XM's use of the copyrighted music that is the lifeblood of its subscription satellite radio service. The royalty, in turn, was expressed in the regulations as a set percentage of Sirius XM's "Gross Revenues" as that term was defined. The thrust of SoundExchange's case is that Sirius XM was – until the regulations were changed earlier this year – systematically excluding from its Gross Revenues certain sources of revenue that the regulations did not permit Sirius XM to exclude.

Thus, this case – like so many others – requires this Court to apply certain regulations and determine whether a regulated entity acted in compliance with, or in violation of, those regulations. It is what courts do every day, particularly in this District. Contrary to the suggestion in Sirius XM's motion to dismiss, this case does *not* require the Court to engage in any sort of policymaking determination that should be made by the agency in the first instance. In fact, this would be the *third* instance, as the CRB already has *twice* performed the policymaking function itself on the very question before this Court: once when it issued the regulations in 2007, and again earlier this year when it ruled – with the same two parties before it

---

[1] Sirius XM was formed by the merger of Sirius Satellite Radio and XM Satellite Radio. This opposition refers to Sirius XM and these predecessor entities as "Sirius XM."

– that its regulations unambiguously prohibited Sirius XM from taking the very same revenue carveouts at issue here.

The only reason, it seems, that Sirius XM wants the issue raised with the CRB yet again, is to get a third bite at the apple in the hope that the CRB will reverse itself and issue a new retroactive rule.  It is not at all clear, however, that the CRB is even authorized to engage in such an inquiry.  As such, this most certainly is not a situation in which a federal court should forgo its "unflagging obligation" to exercise the jurisdiction given it.  Sirius XM's motion to dismiss should be denied.

## BACKGROUND

**A.     The Statutory Framework for the Licensing of Digital Performance Rights**

Section 106 of the Copyright Act grants the owner of a copyright in a sound recording the exclusive right to perform the recording "publicly by means of a digital audio transmission."  17 U.S.C. § 106(6).  As a counterbalance to this right, however, Congress also granted various entities – including any satellite digital audio radio service (SDARS), of which Sirius XM is the nation's only one – a compulsory "statutory license" to perform these recordings digitally.  17 U.S.C. §§ 112, 114(d)(2).  As a statutory licensee, Sirius XM is able to publicly perform all covered recordings (by transmitting them to millions of paying subscribers and generating billions of dollars of revenues annually) without fear of copyright infringement.

The federal statutory license, however, is not free.  Rather, in the event that copyright owners and Sirius XM are unable to agree on the license's royalty rates and terms, the Copyright Act requires the federal CRB to "determine reasonable rates and terms of royalty payments" for the statutory license.  17 U.S.C. § 114(f)(1)(A).  The Copyright Act provides that the CRB-set rates "shall . . . be binding on all copyright owners of sound recordings and entities performing

sound recordings," such as Sirius XM.  *Id.* § 114(f)(1)(B).  The Act does not, however, confer any enforcement authority upon the CRB.

**B.      The CRB's Regulations Governing Sirius XM's Statutory License**

On January 24, 2008, the CRB promulgated regulations setting the license fees that any satellite radio service would pay from 2007 to 2012.  *See* Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 73 Fed. Reg. 4080, 4099 (Jan. 24, 2008) ("2007-2012 CRB Decision").  Those regulations stated that all royalty payments are to be made to SoundExchange, a nonprofit organization designated to collect statutory license royalties and distribute those royalties as required by statute to the appropriate recording artists and record companies.  17 U.S.C. § 114(g)(2)(A)-(D).

Under the CRB's regulations, Sirius XM's royalty fee was calculated as a percentage of its "Gross Revenues," with the specific percentage increasing from 6% in 2007 to 8% in 2012.  *See* 2007-2012 CRB Decision, 73 Fed. Reg. at 4098 (promulgating 37 C.F.R. § 382.11); *see also* Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 78 Fed. Reg. 23,054, 23,096 (Apr. 17, 2013) (2013-2017 CRB Decision). The regulations – which essentially adopted Sirius XM's proposal to the CRB – defined Gross Revenues as follows:

> (1) Gross Revenues shall mean revenue recognized by the Licensee in accordance with GAAP from the operation of an SDARS, and shall be comprised of the following:
>
>> (i) Subscription revenue recognized by Licensee directly from [residential] U.S. subscribers for Licensee's SDARS; and
>>
>> (ii) Licensee's advertising revenues, or other monies received from sponsors, if any, attributable to advertising on channels other than those that use only incidental performances of sound recordings . . .

37 C.F.R. § 382.11 (definition of Gross Revenues).

3

The regulations then provide for a number of exclusions from Gross Revenues. Among other things, they state that Gross Revenues shall exclude the following:

> (vi) Revenues recognized by Licensee for the provision of . . .
>
>> (B) Channels, programming, products and/or other services offered for a separate charge where such channels use only incidental performances of sound recordings; . . . [and]
>>
>> (D) Channels, programming, products and/or other services for which the performance of sound recordings and/or the making of ephemeral recordings is exempt from any license requirement or is separately licensed, including by a statutory license and, for the avoidance of doubt, webcasting, audio services bundled with television programming, interactive services, and transmissions to business establishments.

2007-2012 CRB Decision, 73 Fed. Reg. at 4102 (emphasis added).

## C.      SoundExchange's Lawsuit Against Sirius XM

As alleged in the complaint, Sirius XM has violated the CRB's license fee regulations by unlawfully excluding two broad categories of revenues, resulting in underpayments to SoundExchange totaling up to one hundred million dollars.[2]

### 1.      Exclusion of Revenues Supposedly Attributable to Pre-1972 Sound Recordings

One category of unlawful revenue exclusions alleged in the complaint relates to Sirius XM's performance of sound recordings made prior to February 15, 1972.  The federal digital performance right conferred by the Copyright Act applies only to sound recordings made on or after February 15, 1972.  17 U.S.C. § 301(c).  Sirius XM, however, plays a substantial volume of sound recordings made *before* that date – so-called "pre-1972 recordings" that it claims are not

---

[2] Besides the exclusions that are the focus of Sirius XM's motion to dismiss, the lawsuit also alleges that Sirius XM (a) has unlawfully excluded revenues associated with its *Mostly Music* and *Family Friendly* packages (Count 3); and (b) has failed to pay late fees associated with untimely payments and submissions of "statements of account" (Count 4).

4

subject to any license requirement.  *See* Compl. ¶¶ 25, 47.  Significantly, Sirius XM did not

specifically recognize *any* revenue for the performance of pre-1972 recordings.  Nevertheless,

Sirius XM took it upon itself to exclude from its calculation of Gross Revenues under 37 C.F.R.

§ 382.11(vi)(D) an amount of money supposedly attributable to the performance of pre-1972

recordings.  Compl. ¶ 23; *see* MTD 8-9 (essentially admitting this conduct); 2013-2017 CRB

Decision, 78 Fed. Reg. at 23,080 (observing that Sirius XM had reduced its reported Gross

Revenues by between 10% and 15% on the theory that it corresponded to performances of pre-

1972 recordings).  That revenue exclusion was wholly unauthorized by the regulations in place

for the 2007-2012 period.  Compl. ¶ 24.  As the CRB recently explained with respect to Sirius

XM, "there is no revenue recognition for the performance of pre-1972 works" and thus Sirius

XM's decision to exclude a certain amount of its revenue under 37 C.F.R. § 382.11(vi)(B) that it

unilaterally deemed attributable to such works was "not the proper means for addressing pre-

1972 recordings."  2013-2017 CRB Decision, Fed. Reg. at 23,073.

> ## 2.      Exclusion of Revenues Associated With Sirius XM Premier Subscriptions

A second category of unlawful revenue exclusions alleged in the complaint relates to fees

that Sirius XM receives for its premium subscription package.  Sirius XM offers subscribers a

number of different packages to choose from.  Some are fairly specialized and contain only

music channels, or only talk, or only sports.  "Sirius XM Select," however, is Sirius XM's basic

satellite radio package.  It is a bundled package of over 140 music, talk and sports channels,

many of which make frequent use of copyrighted sound recordings.  Compl. ¶ 27.  In addition,

Sirius XM offers a premium subscription option – called "Sirius XM Premier" – as a higher-

priced alternative to its basic package.  Compl. ¶ 28.[3]  Like the basic Select package, the Premier

package is a bundled package that contains a broad mix of music and non-music channels.  *Id.*

Today, Sirius XM offers its bundled Select package for $14.99 per month, and its bundled

Premier package for $17.99 per month.  *Id.*

As the complaint explains, Sirius XM has unlawfully excluded from Gross Revenues the

incremental amount that it receives when a subscriber chooses its Premier package rather than its

Select package.  Compl. ¶ 31.  The CRB's regulations provide that channels that "use only

incidental performances of sound recordings" may give rise to a revenue exclusion, but only

where they are "offered for a separate charge."  37 C.F.R. § 382.11(vi)(B); *see* 2007-2012 CRB

Decision, 73 Fed. Reg. at 4,087 (describing Gross Revenues definition as excluding revenues for

premium non-music channels "that are offered for a charge separate from the general

subscription charge for the service").  And, here again, the CRB recently confirmed, with this

precise practice of Sirius XM's before it, that "the exclusion is available *only* to the extent that

the channels, programming, products and/or other services are offered *for a separate charge*."

2013-2017 CRB Decision, 78 Fed. Reg. at 23,072 n.45 (emphasis added). The non-music

channels offered as part of Sirius XM's Premier package are not "offered for a separate charge."

Rather, they are part of a larger bundled package that contains both music and non-music

programming and is offered for a single price.  Compl. ¶¶ 29, 31-32.

---

[3] As the complaint alleges, Sirius XM – which is the product of a merger between Sirius and XM
– continues to offer separately branded Sirius Premier and XM Premier packages, as well as a
co-branded Sirius XM Premier package.  The complaint alleges, on information and belief, that
Sirius XM has erroneously excluded incremental subscription revenue from all three packages in
the same manner.  *See* Compl. ¶ 4 n.1.  For simplicity, this opposition to Sirius XM's motion
uses "Sirius XM Premier" or "Premier" to refer to all three packages.

## ARGUMENT

Relying on the doctrine of primary jurisdiction, Sirius XM asks this Court to dismiss (or stay) SoundExchange's suit so that the CRB may weigh in on whether Sirius XM violated the applicable CRB regulations when it excluded from its "Gross Revenues" the two types of revenue discussed above for purposes of calculating the royalty payable to SoundExchange.  The United States Court of Appeals for the District of Columbia Circuit has emphasized that the doctrine of primary jurisdiction is a narrow exception to "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them."  *Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 351 (D.C. Cir. 2003) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  And, as we show below, nothing about this case warrants the invocation of that narrow doctrine here.

Specifically, (i) the applicable regulations are clear and unambiguous; (ii) those regulations already have been interpreted and applied by the CRB to the precise facts alleged here and between the identical parties; (iii) SoundExchange's claims do not call upon this Court to make policy but rather to simply enforce regulations that embody the policy judgment already made by the appropriate agency; (iv) there is no risk of non-uniform outcomes where, as here, the case is solely for damages against literally the only entity to which the regulations apply; and (v) it is unlikely that the CRB even has jurisdiction to hear SoundExchange's claims and award the monetary relief it seeks.  For all of these reasons, Sirius XM's motion should be denied.[4]

---

[4] With respect to SoundExchange's third and fourth claims – relating to unpaid late fees and improper exclusion of revenues from *Family Friendly* and *Mostly Music* subscriptions – Sirius XM makes no argument that those claims independently make the doctrine of primary jurisdiction appropriate.  Rather, in a footnote, Sirius XM asserts that these two claims should be referred to the CRB only "to the extent that the doctrine of primary jurisdiction counsels this Court's deference to the CRB on the pre-1972 and SiriusXM Premier underpayment claims." MTD 9 n.4.

I.     **THE DOCTRINE OF PRIMARY JURISDICTION DOES NOT APPLY WHERE GOVERNING REGULATIONS ARE UNAMBIGUOUS AND ALREADY HAVE BEEN INTERPRETED AND APPLIED BY THE AGENCY THAT ISSUED THEM.**

Although "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956), it has no application in the vast majority of cases that fall "within the conventional competence of courts."  *United States v. Phillip Morris USA Inc.*, 686 F.3d 832, 838 (D.C. Cir. 2012) (quotation marks omitted).  Thus, courts have declined to refer matters to agencies where a case calls for the application of regulations that are unambiguous.  *See Farley Transp. Co.*, *v. Santa Fe Trail Transp. Co.*, 778 F.2d 1365, 1370-71 (9th Cir. 1985).  Similarly, it has long been recognized that referral to an agency on primary jurisdiction grounds is improper where the relevant agency has already addressed the question at issue or otherwise clarified how its regulations should be applied in a given context.  *See W. Pac. R.R.*, 352 U.S. at 69 ("Certainly there would be no need to refer [a] matter of construction to the [agency] if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it.").

Here, despite Sirius XM's attempts to cast the governing regulations as ambiguous, *see* MTD at 11, they are not.  In fact, they are rather straightforward.  As is common, the CRB structured the royalty that Sirius XM would owe to SoundExchange as a percentage of Sirius XM's revenue.  Thus, the royalty is expressed as a rate times a revenue base.  If either the rate or the base is increased, the royalty goes up.  If either is decreased, the royalty goes down.  The rate was defined as 8%, rising each year from a starting point of 6%.  In turn, the revenue base was defined as essentially all subscription and advertising revenue for the satellite radio service, 37 C.F.R. § 382.11(1), minus certain enumerated exclusions.  Two of those exclusions are relevant here.  One was for "*revenues recognized for* the performance of" music not subject to any license

requirement (e.g., those in the public domain).  37 C.F.R. § 382.11(vi)(B) (emphasis added).

The other was for "*revenues recognized for* the performance of" non-music channels and

programming "offered for a *separate charge*."  37 C.F.R. § 382.11(vi)(D).

Here, SoundExchange claims that Sirius XM underpaid the royalties it owed by

excluding revenue in two ways that violated the regulations.  *First*, Sirius XM excluded revenue

that it claimed was somehow attributable to music that was not subject to any license (here,

music recorded prior to 1972 according to Sirius XM), even though it *recognized no revenue* for

those recordings as the regulations require.  *See* Compl. at ¶¶ 42-47.  Second, it excluded certain

revenues that it claimed were attributable to non-music channels offered as part of the Premier

Package, even though the non-music channels were not "offered for a separate charge" but were

bundled with the music channels and offered for one bundled price.  *See* Compl. at ¶¶ 48-53.

Certainly, there is nothing ambiguous about the regulations or how they apply to Sirius XM's

conduct.

Moreover, to the extent Sirius XM wishes to manufacture ambiguity where none exists

and claim that the CRB must resolve that ambiguity in the first instance, the CRB already has

done so.  Just last year, Sirius XM and SoundExchange were before the CRB in a proceeding to

determine the royalty rate for 2013-2017.  During that proceeding, these precise issues were put

squarely before the CRJs and the CRJs reemphasized that the regulations mean what they say –

rejecting the "ambiguity" that Sirius XM now seeks to concoct.

With respect to Sirius XM having excluded revenue during the 2007-2012 period as

allegedly attributable to pre-1972 recordings, the CRJs explained:

> Sirius XM broadcasts pre-1972 recordings on its SDARS service and, in the present
> license period, excludes a portion of revenues from its Gross Revenues calculation for
> such use.  *The current Gross Revenues definition does not expressly recognize such an*

> *exclusion, which is not surprising given that there is no revenue recognition for the performance of pre-1972 works.*

78 Fed. Reg. at 23,073 (emphasis added).  They further explained that a *"revenue exclusion is not the proper means for addressing pre-1972 recordings." Id.*  "To be allowable, a deduction for pre-1972 recordings must be precise and the methodology transparent," which an exclusion from revenue was decidedly not.

In turn, the CRJs adopted a new mechanism for Sirius XM to account for its use of pre-1972 recordings prospectively in the 2013-2017 rate period.  *Id.*  In doing so, however, the CRJs had no difficulty making it crystal clear that no such mechanism was available under the 2007-2012 regulations (which are at issue here), and that the exclusion from revenue that Sirius XM was unilaterally taking during 2007-2012 period was *not* permitted under the governing regulations.

Similarly, the question of Sirius XM's having excluded revenue allegedly attributable to the non-music channels in their Premier Package was squarely put before the CRJs in the most recent ratemaking proceeding.  There, SoundExchange argued that the exclusion from revenue violated the regulations because, among other things, the non-music channels were not "offered for a separate charge" as the regulations required.  *See* 37 C.F.R. § 382.11(vi)(B).  By contrast, Sirius XM seemed to believe that the exclusion from revenue was permissible because they estimated what customers would be paying for the non-music channels in the Premier Package *as if* they had been offered for a separate charge. Here again, the CRJs had no difficulty clarifying that "the exclusion is available *only* to the extent that the channels, programming, products and/or other services are offered *for a separate charge*."  2013-2017 CRB Decision, 78 Fed. Reg. at 23,072 n.45 (emphasis added).

In 2008, the CRJs adopted clear and unambiguous regulations that govern this case. Earlier this year, they issued a subsequent decision interpreting and applying those regulations to the precise questions at issue here.  There is no conceivable argument for why these issues should be sent back to the CRJs for a *third* time.  That is not what the doctrine of primary jurisdiction is for, and to invoke it here would be decidedly improper.  *See W. Pac. R.R.*, 352 U.S. at 69 ("Certainly there would be no need to refer [a] matter of construction to the [agency] if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it.").

## II.     NONE OF THE TRADITIONAL GROUNDS FOR INVOKING THE DOCTRINE OF PRIMARY JURISDICTION EXISTS HERE.

Dismissing a case on primary jurisdiction grounds can be appropriate under two very narrow circumstances:  where an issue requires "the expert and specialized knowledge of the agencies," or where there is a need for "uniformity [of outcomes] which would obtain if initially a specialized agency passed on certain types of administrative questions," *Kappelmann v. Delta Air Lines, Inc.*, 539 F.2d 165, 169 (D.C. Cir. 1976); *see Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n*, 965 F.2d 1118, 1120 (D.C. Cir. 1992) ("[P]rimary jurisdiction . . . rests both on a concern for uniform outcomes . . . and on the advantages of allowing an agency to apply its expert judgment."); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 496 F.2d 214, 222 (3d Cir. 1974) (explaining that referral under the doctrine of primary jurisdiction is appropriate where a case requires "the comparative evaluation of complex technical, economic, and policy factors, as well as consideration of the public interest").  Thus, the D.C. Circuit has referred cases to agencies when the issue presented was purely a policy question, such as whether a new drug was "safe and effective for interstate sale," *Israel v. Baxter Laboratories., Inc.*, 466 F.2d 272, 280 (D.C. Cir. 1972), or when a case would require a court to determine "how much radioactivity is

'significant,' ... and what constitutes 'adequate warning' [of the presence of radioactivity]," *Kappelmann*, 539 F.2d at 171 (footnote omitted).[5]  By contrast, the doctrine has no application where the issue "regardless of its complexity, is not the reasonableness of the rate or rule, but a violation of such rate or rule," *Civil Aeronautics Board  v. Modern Air Transp., Inc.*, 179 F.2d 622, 624 (2d Cir. 1950).  Similarly, where uniformity of outcomes is not a concern – such as when a suit addresses only past conduct under regulations that are no longer in effect – courts decline to refer cases to agencies and instead exercise their own jurisdiction.  *See Allied Air Freight, Inc. v. Pan Am. World Airways, Inc.*, 393 F.2d 441, 448 (2d Cir. 1968) (declining to invoke primary jurisdiction where the district court's order "would not have prospective applicability" because "[t]he allegations of the complaint relate to actions that have been completed").

### A.     This Case Does Not Involve a Question of Policy or The Application Of Agency Expertise, But Rather The Interpretation Of Existing Regulations.

In its motion to dismiss, Sirius XM tries repeatedly to suggest that this case calls upon the Court to make a policy decision regarding whether and how pre-1972 recordings should be accounted for under federal law and when revenue for non-music programming should be excludable from the applicable rate base.  Neither of those policy issues is before this Court.

---

[5] *See, e.g.*, *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 305 (1976); (doctrine might apply where case's resolution "could be facilitated by an informed evaluation of the economics or technology of the regulated industry"); *Atchiston, T. & S. F. Rwy. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 824-25 (1973) (reasoning that "public interest is not a simple fact, easily determined by courts," and thus ruling that referral under the doctrine of primary jurisdiction was appropriate); *Ellis v. Tribune Television Co.*, 443 F.3d 71, 84 (2d Cir. 2006) ("The Commission's weighing of the 'public interest' in considering a waiver request is thus similar to the type of 'public interest' or 'reasonableness' determinations that the Supreme Court has emphasized require administrative – rather than judicial – review under the primary jurisdiction doctrine.").

Rather, as the discussion in Part I above makes plain, the CRB already has addressed and resolved those policy questions – twice.

Indeed, the issues in this case lie squarely within the core competency of this and any other federal Court.  SoundExchange's complaint alleges that Sirius XM has violated the CRB's regulations by underpaying royalties.  *See, e.g.*, Compl. ¶¶ 46, 52.  By way of defense, Sirius XM offers one particular interpretation of the CRB's regulations.  *See, e.g.*, MTD 8 (asserting that Sirius XM excluded certain revenues "pursuant to its understanding of the CRB's ruling"); 37 C.F.R. § 382.11 (definition of Gross Revenues).  As Sirius XM itself acknowledges, this case presents a dispute over the "proper construction and application of the CRJs' own final determination" – *i.e.*, the governing CRB regulations.  MTD 12.  A dispute over whether a regulated party has erroneously construed an agency's regulation, and thus has violated that regulation, falls squarely within the core competency of a court.  *See, Dreisbach v. Murphy*, 658 F.2d 720, 725 (9th Cir. 1981) ("Either the language of the approved . . . Agreements authorizes the Carriers to agree to use one devanner or it does not.").  Indeed, courts routinely interpret agency regulations – in situations that include disputes between two private parties – without ever suggesting the matter lies outside the realm of judicial expertise.  *See, e.g.*, *Vahey v. Gen. Motors Corp.*, Civ. A. No. 11-661,  –  F. Supp. 2d – , 2013 WL 57387601 (D.D.C. Oct. 23, 2013); *Dimondstein v. Am. Postal Workers Union*, Civ. A. No. 13-1228, –  F. Supp. 2d. – , 2013 WL 4578306 (D.D.C. Aug. 29, 2013)*; Williamson v. Cox*, No. Civ. A. 12-0712, –  F. Supp. 2d – , 2013 WL 3388609, at *4-7 (D.D.C. July 9, 2013); *Lee v. Hartford Life & Acc. Ins. Co.*, 928 F. Supp. 2d 51, 54-57 (D.D.C. 2013); *Etheridge v. FedChoice Fed. Credit Union*, 789 F. Supp. 2d 27, 36-39 (D.D.C. 2011).

To be sure, questions of copyright policy, as well as the statutory rate-setting factors, bear on the CRB's decision whether to create particular exclusions in the first place. But they have no bearing on whether the language of an existing regulation in fact permits the exclusions that Sirius XM has taken. In urging that this case entails substantial policymaking and calls for the application of agency expertise, what Sirius XM really is saying is that the CRB *should* have authorized the exclusions that it took. Sirius XM would have been well within its rights to ask the CRB to permit these exclusions in the CRB's ratemaking for the 2007-2012 period (and, if the CRB had agreed, the CRB might well have set the royalty rate at a higher percentage of a smaller Gross Revenues base). But the time for that has long since passed, as the CRB has already twice ruled on what revenue exclusions were permissible. The question now is one of enforcing the agency's regulations for damages. That is well within the core competence of the federal courts. *See Litton Sys. Inc. v. Sw. Bell Tel. Co.*, 539 F.2d 418, 423 n.13 (5th Cir. 1976) (finding "primary jurisdiction could not apply with respect to the damages portion of [the] lawsuit" addressing past conduct, "even if it must apply to the injunctive portion"); *see also Carnation Co. v. Pac. Westbound Conference*, 383 U.S. 213, 222 (1966) ("The award of treble damages for past and completed conduct which clearly violated the Shipping Act would certainly not interfere with any future action of the [Federal Maritime] Commission.").

**B.      A Decision By This Court Poses No Risk To Uniform Application Of The Law.**

As explained above,  and as Sirius XM itself recognizes, *see* MTD 11, a principal purpose of the doctrine of primary jurisdiction is to prevent the divergent rulings that may result "if disparate courts resolve regulatory issues inconsistently." *Phillip Morris*, 686 F.3d at 837;

*see, e.g.*, *Far East Conference v. United States*, 342 U.S. 570, 574-75 (noting that primary jurisdiction secures "[u]niformity and consistency in the regulation of business entrusted to a particular agency") (quotation marks omitted); *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010) (expressing concern about "the risk that individuals and companies will be subject to decisions pointing in opposite directions"); *Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199, 202 (5th Cir. 1988) ("Conflicting decisions among the districts, even when brought into closer conformity by appellate decisions, are at best a patchwork solution to a problem that requires uniform resolution."). Sirius XM is wrong, for two reasons, in arguing that this concern for uniformity supports dismissal here.

*First*, Sirius XM is the only entity that is subject to the regulations at issues. As discussed above, the regulations apply only to providers of commercial satellite radio, and Sirius XM is the nation's only satellite radio provider.[6]  *See* 17 U.S.C. § 114(j)(10).  Because no entity other than Sirius XM was ever subject to the relevant 2007-2012 regulations, there can be no risk of non-uniform outcomes that would subject different competitors in the same industry to different obligations under the same regulations.

*Second*, this is only a suit for damages for Sirius XM's past conduct.  It is not a suit for prospective injunctive relief that could result in Sirius XM being subject to inconsistent or conflicting obligations going forward.  For example, with respect to Sirius XM's pre-1972 revenue exclusion, the issue before the court cannot arise again even between SoundExchange and Sirius XM.  As set forth above, in its decision setting rates for the 2013-2017 period, the CRB promulgated a prospective means *other than* revenue exclusion to account for performances of pre-1972 music.  *See* 78 Fed. Reg. 23,073.  Thus, the issue here – Sirius XM's

_____

[6] As noted above, Sirius XM was formed by the merger of Sirius Satellite Radio and XM Satellite Radio.

violation of the 2007-2012 regulations – is solely backward looking and should have no impact on Sirius XM's future conduct or the future conduct of any other entity.

### C.      It Is Not Clear That The CRB Is Authorized To Hear SoundExchange's Claims Or Grant The Relief Requested.

Sirius XM's primary jurisdiction argument necessarily depends on a conclusion that the CRB would, in fact, have jurisdiction to issue the appropriate rulings and order the appropriate relief.  Indeed, "[w]here no administrative remedy exists, the doctrine of primary jurisdiction does not apply."  *United States v. Elrod*, 627 F.2d 813, 818 (7th Cir. 1980); *see id.* ("Uncertainty as to the scope of [the agency's] administrative authority thus militates against initial resort to the agency here."); *Montana-Dakota Utils Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 254 (1951) ("[W]e know of no case where the court has ordered reference of an issue which the administrative body would not itself have jurisdiction to determine in a proceeding for that purpose."); *Local Union No. 189, v. Jewel Tea Co.*, 381 U.S. 676, 687 (1965) ("we must reject the unions' primary-jurisdiction contention because of the absence of an available procedure for obtaining a Board determination."); *Allied Air Freight*, 393 F.2d at 448  (declining to invoke primary jurisdiction when the agency was "unable to give the relief which appellant seeks" because it "ha[d] no power to award damages for unfair competitive practices").  Here, the CRB's limited powers provide yet another reason why resort to the doctrine of primary jurisdiction is improper.

*First*, the CRB is empowered to set rates and promulgate regulations – but it has no authority to enforce its regulations against an entity that fails to comply.  Thus, the CRB cannot award SoundExchange damages for Sirius XM's underpayment of royalties.  Rather, to obtain a damages award, SoundExchange would have to return to this Court.  That alone is reason enough to reject Sirius XM's primary jurisdiction argument.  *See Ryan v. Chemlawn Corp.*, 935 F.2d

129, 131 (7th Cir. 1991) (refusing to invoke primary jurisdiction because the plaintiff sought "only monetary damages" and the agency "cannot provide the plaintiff with any form of compensatory or punitive damages").

*Second*, it is far from clear that the CRB can issue even the sort of declaratory, interpretive rulings that Sirius XM proposes.  The "continuing jurisdiction" provision on which Sirius XM relies, *see* MTD 6-7, provides the CRB only with limited authority to (a) "correct any technical or clerical errors in the [rate-setting] determination"; or (b) "modify the terms, but not the rates, of royalty payments in response to unforeseen circumstances that would frustrate the proper implementation of such determination."  17 U.S.C. § 803(c)(4).  The interpretive, and retroactive, rulings that Sirius XM proposes cannot plausibly be characterized as a "correct[ion]" of "technical or clerical errors," nor as a "response to unforeseen circumstances."  Indeed, if SoundExchange were to initiate a proceeding to seek the interpretive rulings that Sirius XM envisions, SoundExchange would not be asking the CRB to "correct" or "modify" anything at all.  Rather, it would be requesting that the CRB reiterate that, when it promulgated the definition of Gross Revenues, it meant exactly what it said.[7]

---

[7] Should the Court disagree with SoundExchange and refer this matter to the CRB under the doctrine of primary jurisdiction, this case should be stayed, not dismissed without prejudice.  Not only is a stay the customary course of action when a court refers a matter for agency resolution, *see, e.g.*, *American Ass'n. of Cruise Passengers v. Cunard Cruise Line, Ltd.*, 31 F.3d 1184, 1187 (D.C. Cir. 1994), but SoundExchange would be prejudiced were this Court to dismiss the suit.  SoundExchange's filing of this lawsuit tolled the statute of limitations on its claims against Sirius XM.  *See, e.g.*, *Ciralsky v. CIA*, 355 F.3d 661, 672 (D.C. Cir. 2004).  If the case were dismissed without prejudice, rather than merely stayed, the statute of limitations would begin to run once again.  *See id.*  And there is no assurance that the CRB, for its part, would act promptly.  The result might well be that SoundExchange's claims, though not time-barred today, would be time-barred by the time they returned to this Court.  *See Am. Ass'n. of Cruise Passengers*, 31 F.3d at 1187 (explaining that dismissal would be particularly inappropriate if new judicial proceedings after the completion of agency proceedings might be time-barred, and stressing that "the district court could effortlessly hold the suit in abeyance pending the outcome of the proceedings before the [agency]").

## CONCLUSION

For the foregoing reasons, Sirius XM's motion to dismiss should be denied.


Dated: December 2, 2013                    Respectfully submitted,


                                           /s/ Michael B. DeSanctis

                                           Michael B. DeSanctis (D.C. Bar #: 460961)
                                           Joshua M. Segal (D.C. Bar #: 975949)
                                           Ishan K. Bhabha (D.C. Bar #: 1015673)
                                           JENNER & BLOCK LLP
                                           1099 New York Avenue NW, Suite 900
                                           Washington, D.C. 20001
                                           (202) 639-6000

                                           *Counsel for Plaintiff SoundExchange, Inc.*

18

## CERTIFICATE OF SERVICE

I, Michael B. DeSanctis, do hereby certify that the foregoing opposition was electronically filed and served via ECF on the 2nd day of December, 2013, to the following:

Adam B. Banks
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8419
(212) 310-8007 (fax)

*Counsel for Sirius XM Radio Inc.*

Todd D. Larson
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8238
(212) 310-8007 (fax)
todd.larson@weil.com

*Counsel for Sirius XM Radio Inc.*

Peter Dean Isakoff
WEIL, GOTSHAL & MANGES, LLP
1300 Eye Street, NW
Suite 900
Washington, DC 20005
(202) 682-7155
(202) 857-0940 (fax)
peter.isakoff@weil.com

*Counsel for Sirius XM Radio Inc.*

R. Bruce Rich
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8170
(212) 310-8007 (fax)
bruce.rich@weil.com

*Counsel for Sirius XM Radio Inc.*

/s/ Michael B. DeSanctis
_____
Michael B. DeSanctis