**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**SOUNDEXCHANGE, INC.,**

**Plaintiff,**

v.

**SIRIUS XM RADIO INC.,**

**Defendant.**

**Case No. 1:13 cv 1290 (RJL)**

**DEFENDANT SIRIUS XM RADIO INC.'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO DISMISS**

R. Bruce Rich (*pro hac vice*)
Todd Larson (*pro hac vice*)
Adam Banks (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
bruce.rich@weil.com
todd.larson@weil.com
adam.banks@weil.com

Peter D. Isakoff (D.C. Bar No. 358419)
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW Suite 900
Washington, D.C., 20005
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
peter.isakoff@weil.com

*Counsel for Sirius XM Radio Inc.*

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....... 1

ARGUMENT ....... 3

I. This Case is a Prime Candidate for Referral under the Primary Jurisdiction Doctrine ....... 3

A. SoundExchange Misconstrues the CRB's Decisions in *Satellite I* and *Satellite II* ....... 3

1. The *Satellite I* Determination Refutes SoundExchange's Contentions ....... 3

2. *Satellite II* Neither Construed Satellite I nor Reviewed Sirius XM's Royalty Calculations for the 2007-2012 License Period ....... 4

3. *Satellite II*'s Mechanism for Calculating Exclusions Attributable to Pre-1972 Sound Recordings, If Anything, Confirms the Lack of Merit in SoundExchange's Allegations of Underpayment ....... 5

4. *Satellite II* Did Not Purport To Construe the Satellite I Exemption for Non-Music Programming ....... 8

B. This Case is an Ideal Candidate for Invoking the Primary Jurisdiction Doctrine ....... 9

II. The CRB has "Continuing Jurisdiction" to Address the Questions Presented in this Case ....... 12

CONCLUSION ....... 15

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*,
965 F.2d 1118 (D.C. Cir. 1992) .......... 10, 11

*Comcast Corp. v. FCC*,
600 F.3d 642 (D.C. Cir. 2010) .......... 13

*Ctr. for Individual Freedom v. Van Hollen*,
694 F.3d 108 (D.C. Cir. 2012) .......... 12

*Davel Commc'ns, Inc. v. Qwest Corp.*,
460 F.3d 1075 (9th Cir. 2006) .......... 11

*Ricci v. Chi. Mercantile Exch.*,
409 U.S. 289 (1973) .......... 13

*Ryan v. Chemlawn Corp.*,
935 F.2d 129 (7th Cir. 1991) .......... 14

*SoundExchange v. Librarian of Congress*,
571 F.3d 1220 (D.C. Cir. 2009) .......... 3

*In re StarNet, Inc.*,
355 F.3d 634 (7th Cir. 2004) .......... 12

*United States v. Philip Morris USA, Inc.*,
686 F.3d 832 (D.C. Cir. 2012) .......... 10

*United States v. Western Pac. R.R. Co.*,
352 U.S. 59 (1956) .......... 10, 11, 12

**Statutes**

17 U.S.C. § 801(b)(1) .......... 2, 10

17 U.S.C. § 803(c)(4) .......... 13

**Other Authorities**

37 C.F.R. 382.11 .......... *passim*

37 C.F.R. 382.12 .......... 5, 7

Copyright Office, Review of Copyright Royalty Judges Determination, 74 Fed. Reg. 4537 (Jan. 26, 2009) .......... 13

Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 78 Fed. Reg. 23054 (Apr. 17, 2013) (*Satellite II*) ...................... *passim*

Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 73 Fed. Reg. 4080 (Jan. 24, 2008) (*Satellite I*) .......................... *passim*

## PRELIMINARY STATEMENT

The central premise of SoundExchange's opposition is that the primary jurisdiction doctrine is inappropriate here because the Copyright Royalty Board —twice, in its count—has already "unambiguously" determined that Sirius XM was not entitled to certain royalty fee exclusions it took between 2007 and 2012. *See* SoundExchange Mem. at 1. That argument conveniently assumes away the parties' dispute, which arises because Sirius XM interpreted the same CRB rate determination[1] and the regulations enacted under it as unambiguously *supporting* the challenged exclusions. The point of remitting this controversy to the CRB is to enable the agency that crafted the regulations at issue to opine as to what it actually intended and whether Sirius XM's practices comport with that intention.

SoundExchange is also wrong on the merits. The disputed revenue definition states clearly that Sirius XM should not pay royalties to SoundExchange for programming "exempt from any license requirement" and programming with "only incidental performances of sound recordings." 37 C.F.R. 382.11(3)(vi) (2008). The reason for such exclusions is obvious: revenue earned by Sirius XM for activities "not licensed under the statutory royalty regime"—*e.g.*, performances of pre-1972 recordings or non-music programming—"should not factor into determining the statutory royalty obligation." Copyright Royalty Board, Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 78 Fed. Reg. 23054, 23073 (Apr. 17, 2013) ("*Satellite II*").

SoundExchange brazenly contends that Sirius XM should have disregarded that fundamental premise and paid SoundExchange tens of millions of dollars in royalties for such

[1] *See* Copyright Royalty Board, Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 73 Fed. Reg. 4080 (Jan. 24, 2008) ("*Satellite I*").

programming anyway. It bases this conclusion on a meritless accounting quibble (relating to when revenue is "recognized" under GAAP) and the misconception that the Copyright Royalty CRJs, in *Satellite II*, determined how to interpret *Satellite I* and evaluated Sirius XM's practices under that decision. They did not. As we demonstrate herein, the CRJs in *Satellite II* forcefully reiterated their holding that Sirius XM should *not* pay SoundExchange for programming unrelated to the statutory license and expressly rejected SoundExchange's attempt to eliminate the exemptions for such programming. What is more, the CRJs prescribed a method for calculating such exemptions for the 2013-2017 license period that is nearly identical, both in approach and economic consequence, to the methodology utilized by Sirius XM for the period in dispute. These conclusions *support*, not contradict, Sirius XM's payment calculations during the 2007-2012 period. A referral to the CRB should quickly and efficiently confirm the propriety of Sirius XM's approach.

SoundExchange's further suggestion that this case concerns a garden variety interpretation of mundane agency regulations, something courts do "every day," SoundExchange Mem. at 1, is also erroneous. The CRB is uniquely positioned to opine on the intended economic outcome of its *Satellite I* determination in light of both the extensive hearing record before it and the statutory policy factors that guide its determinations. *See* 17 U.S.C. § 801(b)(1). It is also uniquely positioned to opine on SoundExchange's attempt to fundamentally alter the economics that determination and the CRJs' careful balancing of the statutory factors. Courts routinely refer technical questions of the sort raised by the Complaint to administrative agencies in recognition of their peculiar expertise and familiarity with the entire panoply of relevant considerations.

## ARGUMENT

### I. This Case is a Prime Candidate for Referral under the Primary Jurisdiction Doctrine

#### A. SoundExchange Misconstrues the CRB's Decisions in *Satellite I* and *Satellite II*

##### *1. The Satellite I Determination Refutes SoundExchange's Contentions*

The CRB has repeatedly stressed, as should be self-evident, that users of the statutory license like Sirius XM do not have to pay royalties for programming not covered by that license. In *Satellite I*, the CRJs explained that the revenue definition should "unambiguously relate[] the fee to the value of the sound recording performance rights at issue." 73 Fed. Reg. at 4087–88. Similarly, in *Satellite II*, the CRJs stated that "pre-1972 recordings are not licensed under the statutory royalty regime and should not factor into determining the statutory royalty obligation." 78 Fed. Reg. at 23073. Likewise, the D.C. Circuit, in the course of affirming *Satellite I*, observed that "SoundExchange never contended and the CRJ[s] never opined that revenue from such non-music sources should be included in calculating the royalty payments." *SoundExchange v. Librarian of Congress*, 571 F.3d 1220, 1225 (D.C. Cir. 2009).

In accordance with these principles, the CRJs' decision in *Satellite I* provided for the following exclusions from Gross Revenues—the base on which the royalty payment is calculated—to ensure the omission of revenue attributable to programming exempt from the license:

- "revenues recognized by [the] Licensee for the provision of . . . channels, programming, products and/or other services offered for a separate charge where such channels use only incidental performances of sound recordings," 37 C.F.R. 382.11(3)(vi)(B) (2008); and

- "channels, programming, products and/or other services for which the performance of sound recordings . . . is exempt from any license requirement," 37 C.F.R. 382.11(3)(vi)(D) (2008).

While *Satellite I* did not spell out the precise mechanics for implementing the exclusions, the CRJs plainly intended to "relate[] the fee to the value of the sound recording performance rights at issue." SoundExchange's purportedly "unambiguous" construction of the CRB's regulations would nullify the above-stated exclusions, impose an unauthorized surcharge on statutory licensees like Sirius XM, and confer a concomitant windfall on SoundExchange. SoundExchange's position is so obviously contrary to what the CRB has held, as well to common sense, that it is doing everything possible to avoid making its case to the body best positioned to opine on it, the CRB.

### 2. *Satellite II Neither Construed Satellite I nor Reviewed Sirius XM's Royalty Calculations for the 2007-2012 License Period*

The *Satellite II* proceeding set the statutory royalty rates and terms for the 2013-2017 period. In that proceeding, SoundExchange sought essentially identical relief to that which it seeks here: a nullification of the statutory exclusion from payments of royalties for performances of sound recordings exempt from the statutory license.[2] The CRJs roundly rejected SoundExchange's proposal and reiterated the core principle that "pre-1972 recordings are not licensed under the statutory royalty regime and should not factor into determining the statutory royalty obligation." *Satellite II*, 78 Fed. Reg. at 23073.

[2] As the CRJs summarized the argument, "SoundExchange also proposes to eliminate from the current *Gross Revenues* definition a provision that authorizes an exclusion from revenues received from channels and programming that are licensed outside of the Sections112 and 114 licenses, *which includes pre-1972 recordings*." *Satellite II*, 78 Fed. Reg. at 23071 (emphasis added). Clearly, the CRJs understood the exclusion from Gross Revenues to encompass pre-1972 recordings.

The CRJs then spelled out a specific mechanism to be utilized in calculating the appropriate deduction during the 2013-2017 license period.[3] They had no occasion to decide how the fee deductions established in the *Satellite I* proceeding should have been calculated, let alone opine as to SoundExchange's conception of those deductions or the economic consequences they would have had on the determination reached there. Simply stated, the construction and application of the *Satellite I* rates and terms were not before the CRB during the *Satellite II* proceedings.

This recognition puts to rest the assertion that the CRJs resolved the issue presented here (much less in SoundExchange's favor) by way of their passing remark that "there is no revenue recognition for the performance of pre-1972 works." *Satellite II*, 78 Fed. Reg. at 23073. Not only, as noted, did the *Satellite II* proceeding *not* concern royalty calculations pertaining to the *Satellite I* license period; neither did it contain any reliable record as to Sirius XM's accounting practices during the prior license period or any expert testimony as to what revenue is or is not "recognized" under GAAP.

**3. *Satellite II's Mechanism for Calculating Exclusions Attributable to Pre-1972 Sound Recordings, If Anything, Confirms the Lack of Merit in SoundExchange's Allegations of Underpayment***

A comparison of the mechanism adopted by the CRJs in *Satellite II* for implementing the exclusion for pre-1972 sound recordings for the 2013-2017 period with the process Sirius XM utilized in calculating the same exclusion during the period covered by the *Satellite I* determination exposes SoundExchange's complaint as one of form over substance. In short, the

[3] As discussed below, that mechanism provides that the royalty fee should be reduced by a "Pre-1972 Recording Share," a percentage reflecting the Sirius XM's number of pre-1972 performances divided by the total number of Sirius XM's performances. The regulations define the Pre-1972 Recording Share as "the result of dividing the Internet Performances of Pre-1972 Sound Recordings on the Reference Channels by the total number of Internet Performances of all sound recordings on the Reference Channels." 37 C.F.R. 382.12(e).

two approaches are equivalent in all material respects, yielding substantially the same economic results.

*Satellite I* Royalty Fee Calculation. There were three basic components to Sirius XM's royalty fee calculation under the prior determination:

- **(A) Gross Revenues**, defined as "revenue recognized by the Licensee in accordance with GAAP." 37 C.F.R. 382.11 (2008).

- **(B) An Adjustment for Performances of Pre-1972 Recordings**, determined by calculating the percentage of performances of pre-1972 recordings on Sirius XM (out of the total number of performances) and reducing Gross Revenues by that same percentage.

- **(C) Royalty Rate**, the *Satellite I* determination called for the license fee to equal between 6% and 8% of monthly Gross Revenues.

To calculate its royalty fee obligation, Sirius XM reduced its Gross Revenues by the percentage of pre-1972 sound recordings and then multiplied that adjusted Gross Revenues figure by the applicable royalty rate, as follows:[4]

| | **[A]** | **x** | **[B]** | **x** | **[C]** |
|---|---|---|---|---|---|
| Royalty Payment = | Gross Revenues | | (1 – Pre-1972 Performances / Total Performances) | | Royalty Rate |

*Satellite II* Royalty Fee Calculation. The royalty payment calculation as prescribed the *Satellite II* determination for 2013-2017 is substantively identical. Sirius XM's gross revenues are multiplied by the royalty rate and then reduced by applying the Pre-1972 Recording Share. In other words, the calculation consists of the *same three elements* as the *Satellite I* determination, but in a different order:

---

[4] For example, if Gross Revenues were $1,000,000, 10% of total performances were pre-1972 performances, and the royalty rate was 8%, the total royalty payment would be $72,000: $1,000,000 x (1-.10) x .08 = $72,000.

- **(A) Gross Revenues** as defined at 37 C.F.R. § 382.11.

- **(B) An Adjustment for Performances Pre-1972 Recordings**, determined, just as Sirius XM did under the *Satellite I* determination, by dividing the number of performances of pre-1972 recordings by the total number of performances (the **Pre-1972 Recording Share)** and reducing the royalty obligation by that percentage.

- **(C) Royalty Rate**, the *Satellite II* determination called for the license fee rising each year from 9% to 11% of Gross Revenues, "except that the royalty fee so determined may be reduced by . . . the Pre-1972 Recording Share." 37 C.F.R. 382.12.

Sirius XM's royalty payment is determined by multiplying these three factors in the same way as during 2007-2012. To summarize:

| | **[A]** | **x** | **[C]** | **x** | **[B]** |
|---|---|---|---|---|---|
| Royalty Payment = | Gross Revenues | | Royalty Rate | | $\left(1 - \frac{\text{Pre-1972 Performances}}{\text{Total Performances}}\right)$ [5] |

In short, Sirius XM's approach under the *Satellite I* determination was mathematically equivalent to what the CRJs made explicit under *Satellite II*, except that rather than multiplying A x B x C, the *Satellite II* determination calls for multiplying A x C x B. *See supra* nn. 4 & 5. While the CRJs suggested the formula should be conceptualized as a reduction of the royalty payment to be made, rather than as a reduction of revenue against which the royalty rate applied, the economic results are substantively identical.[6] *Satellite II* is thus completely consistent with Sirius XM's treatment of pre-1972 recordings for the 2007-2012 period.

---

[5] As in the example in n.4, *supra*, if Gross Revenues were $1,000,000, the royalty rate was 8% and 10% of performances were pre-1972 performances, the royalty payment would be $72,000: $1,000,000 x .08 x (1-.10) = $72,000.

[6] There are two minor differences that are not germane to the argument. During 2007-2012, Sirius XM calculated the amount of its Pre-72 exclusion based on its subscription revenues, an amount slightly less than total Gross Revenues. Also, for part of that period, it used plays on its satellite service, as opposed to performances on its webcasting service (where the channels are largely identical) to determine the specific pre-1972 share for a given reporting period. While

Once understood in context, SoundExchange's reliance on the CRJs' statement in *Satellite II* that "revenue exclusion is not the proper means for addressing pre-1972 recordings" as purported evidence that Sirius XM had underpaid royalties for the prior period is evidently misplaced. *Satellite II*, 78 Fed. Reg. at 23073. The quoted language at most suggests that the guidance in *Satellite I* as to precisely how the exemption for pre-1972 recordings should be computed was not specific enough. Its import was conceptual and forward-looking: *i.e.*, the royalty adjustment for pre-1972 recordings should be understood and applied as an exclusion from the total fees owed, rather than applied against the revenue base. Insofar as the *result* of the prescribed *Satellite II* approach leads, as a practical matter, to essentially the same economic results as the methodology Sirius XM employed in the previous licensing period, the inference SoundExchange asks be drawn from the CRJs' statement—that Sirius XM instead should have paid royalties for performances of recordings that are wholly exempt from the license requirement—is completely improper.

**4. *Satellite II* Did Not Purport To Construe the *Satellite I* Exemption for Non-Music Programming**

SoundExchange suggests that in *Satellite II* the CRJs held that Sirius XM's exclusion for non-music programming offered through its premier packages failed to comport with the *Satellite I* exemption for programming "us[ing] only incidental performances of sound recordings" that is "offered for a separate charge." *Satellite I*, 73 Fed. Reg. at 4102; 37 C.F.R. 382.11(3)(vi)(B). This is plainly untrue.

---

these minor differences may have marginally altered Sirius XM's royalty obligations, they do not alter the point that Sirius XM's approach to calculating the fee obligation during 2007-2012 was substantively identical to the one later prescribed by the CRJs in *Satellite II* for 2013-2017.

As Sirius XM explained in its moving papers, the additional all-talk and non-music programming available through its premier packages is "offered for a separate charge" within the meaning of the *Satellite I* determination because the only additional services provided in such packages—and thus the value the consumer receives for the incremental charge for a premier package—is programming that makes only incidental use of sound recordings and exempt from the statutory license. *See* Sirius XM Mem. at 8, 13. SoundExchange contends here that Sirius XM should pay for exempt programming because a clear upcharge for only non-music programming somehow does not count as a "separate charge." SoundExchange Mem. at 5–6. The language in *Satellite II* upon which SoundExchange relies did not pass upon that contention,[7] and indeed did no more than repeat the regulatory text from *Satellite I*: "the exclusion is available only to the extent that the channels, programming, products and/or other services are offered for a separate charge." *Satellite II*, 78 Fed. Reg. at 23072 n.45. If anything, the CRJs once again confirmed that revenues that are attributable to activities not covered by the statutory license should be exempt from the statutory license calculation: "the Judges are driven by the admonition in [*Satellite I*] to include only those revenues related to the value of the sound recording performance rights at issue in this proceeding." *Satellite II*, 78 Fed. Reg. at 23072.

It is clear that the CRJs are in the best position to interpret their own opinions, and should have the opportunity to provide any necessary clarification on this issue in the first instance.

### B. This Case is an Ideal Candidate for Invoking the Primary Jurisdiction Doctrine

Resolution of this case calls for the interpretation and application of the CRJs' own rate determination, a determination they reached after an extensive, multi-week trial and the product

[7] SoundExchange has yet to offer any coherent policy reason (accounting gimmicks aside) that would support a construction of the CRJs' regulations requiring Sirius XM to pay license fees for material exempt from the statutory license.

of the careful balancing of the Section 801(b) policy factors. Congress created the CRB specifically for the expert determination of royalty rates. Questions concerning the proper implementation of the CRB's own rate determinations should properly be decided by the CRB. *See, e.g.*, *United States v. Philip Morris USA, Inc.*, 686 F.3d 832, 837 (D.C. Cir. 2012) ("[W]e have found the primary jurisdiction doctrine applicable when the precise question before the district court was one within the particular competence of an agency."); *Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1122–23 (D.C. Cir. 1992) (finding primary jurisdiction where the issue involved the agency's "interpretation of its own regulations, on which it is owed great deference").

SoundExchange argues that the primary jurisdiction doctrine is not implicated here because the questions concern the straightforward interpretation of unambiguous agency regulations, a function federal courts routinely perform. According to SoundExchange, this case concerns not policy determinations but simple construction of agency regulations. SoundExchange Mem. at 12–14. This argument is misplaced for several reasons.

*First*, policy implications, including the intended economic outcome of the *Satellite I* determination, sit at the heart of the questions presented here. The core function of the CRB is to set "reasonable" rates and terms for the statutory license, taking into account the extensive factual record before it and balancing the statutory Section 801(b) policy factors enumerated by Congress. In challenging Sirius XM's interpretation and implementation of the regulations, SoundExchnage, not only calls into question, but seeks to fundamentally alter, the economics of the CRB's rate determination and its policy choices. The CRB is uniquely positioned to opine on the intended economic effect of its own rate determination, a task specifically delegated to it by Congress. *See United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63 (1956) ("primary

jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties"). In short, the distinction SoundExchange attempts to draw between regulation interpretation and policymaking is a false distinction, particularly with respect to the question now before this Court.[8]

*Second*, SoundExchange's suggestion that the primary jurisdiction doctrine is inapplicable when the question is a matter of the interpretation of agency regulations finds no support in the case law. Courts routinely invoke the primary jurisdiction doctrine when the question presented concerns the proper interpretation of agency regulations, particularly rate determinations that were the product of a highly detailed and technical regulatory process. *See Allnet*, 965 F.2d at 1120 ("[I]t is hardly surprising that courts have frequently invoked primary jurisdiction in cases involving tariff interpretations."); *see also Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1089 (9th Cir. 2006) ("the interpretation of an agency order issued pursuant to the agency's congressionally granted regulatory authority falls within the agency's primary jurisdiction *where the order reflects policy concerns* or issues requiring uniform resolution.") (emphasis added).

For example, in *United States v. Western Pacific Railroad Co.*, 352 U.S. 59 (1956), the seminal case invoking the primary jurisdiction doctrine, the Supreme Court referred a question of tariff interpretation to the Interstate Commerce Commission for resolution. The dispute in *Western Pacific*, as the one here, concerned the proper interpretation of a definition supplied by an agency in the context of its Congressionally-delegated policymaking and rate-setting. The

---

[8] *See Western Pacific*, 352 U.S. at 68–69 ("[T]he mere fact that the issue is phrased in one instance as a matter of tariff construction and in the other as a matter of reasonableness should not be determinative on the jurisdictional issue. To hold otherwise would make the doctrine of primary jurisdiction an abstraction to be called into operation at the whim of the pleader.").

Court held that the ICC should decide the definitional question in the first instance; as the Court explained, "to decide the question of the scope of this tariff without consideration of the factors and purposes underlying the terminology employed would make the process of adjudication little more than an exercise in semantics." *Id.* at 67. Thus, the Court held, the definitional controversy should be resolved "not by the courts but by the agency which had the exclusive power to pass on the rate in the first instance." *Id.* The same logic applies to questions concerning the proper interpretation and application of the CRJs' rate determination.

Similarly, in *In re StarNet, Inc.*, 355 F.3d 634 (7th Cir. 2004), the court referred a question concerning the definition of the word "location" in FCC regulations to the agency: "Instead of trying to divine how the FCC would resolve the ambiguity created by the word 'location,' we think it best to send this matter to the Commission under the doctrine of primary jurisdiction." 355 F.3d at 639. Primary jurisdiction is also often invoked where the court requires further clarification of the existing regulations. *See, e.g.*, *Ctr. for Individual Freedom v. Van Hollen*, 694 F.3d 108, 111 (D.C. Cir. 2012) ("Pursuant to this [primary jurisdiction] doctrine, we will leave it to the FEC in the first instance to explain the meaning and scope of 11 C.F.R. § 104.20(c)(9), or, if the agency deems it appropriate, to engage in further rulemaking to better clarify the regulatory regime."). The fact that this case involves a controversy concerning the proper scope and interpretation of the CRB's own regulations is a reason to invoke the primary jurisdiction doctrine, not to avoid it.

## II. The CRB has "Continuing Jurisdiction" to Address the Questions Presented in this Case

Finally, SoundExchange argues that referral under primary jurisdiction would be inappropriate because it is "far from clear" that the CRB has jurisdiction to address the questions presented. SoundExchange's arguments are not persuasive.

As the D.C. Circuit has held, "for an issue to fall within an agency's primary jurisdiction, the agency need not possess definite authority to resolve it; rather, there need only be 'sufficient statutory support for administrative authority that the agency should at least be requested to proceed' in the first instance." *Comcast Corp. v. FCC*, 600 F.3d 642, 648 (D.C. Cir. 2010) (citing *Ricci v. Chi. Mercantile Exch.*, 409 U.S. 289, 304 (1973)) (alterations omitted); *see also Ricci*, 409 U.S. at 304 (finding primary jurisdiction where "there is sufficient statutory support for administrative authority in this area").

The CRB's "continuing jurisdiction" provides more than sufficient statutory support for its exercise of jurisdiction over the question presented here. As SoundExchange itself acknowledges, the continuing jurisdiction authority granted to the CRB permits it to correct "technical or clerical" errors and to modify the terms of the rate determination "in response to unforeseen circumstances that would frustrate the proper implementation of such determination." 17 U.S.C. § 803(c)(4). Referring this action to the CRB so that it can decide whether Sirius XM's exclusions were proper under the rate determination—or if some other mechanism should have been used to account for its performances of exempt sound recordings—fits easily within either of those two grants of continuing jurisdiction authority. For example, the CRJs used their continuing jurisdiction authority to modify the definition of "interactive stream" in a prior rate determination proceeding, as either a technical correction or a response to "unforeseen circumstances." *See, e.g.*, Copyright Office, Review of Copyright Royalty Judges Determination, 74 Fed. Reg. 4537, 4543 (Jan. 26, 2009).[9] A similar result would obtain here if the CRJs concluded that a technical correction were required to clarify that the Gross Revenues

[9] SoundExchange does not respond to Sirius XM's showing in its moving papers that the CRB has understood its continuing jurisdiction authority very broadly, including using the authority to modify definitions contained in prior rate determinations. *See* Sirius XM Mem. at 7 n.2.

exclusions permitted Sirius XM's exclusions for its exempt performances. Or, alternatively, if the CRJs determined that the revenue exclusion were not the correct way to account for pre-1972 recordings and non-music programming, the CRJs could modify the rate determination to enact a different mechanism to avoid the "unforeseen circumstances" of Sirius XM paying royalties for performances not covered by the statutory license. As discussed *supra*, that was the clear intent of the CRB's rate determination.

Finally, SoundExchange suggests that referral is inappropriate because the CRB does not have the authority to award the damages it seeks. According to SoundExchange, "to obtain a damages award, SoundExchange would have to return to this Court." SoundExchange Mem. at 16. The fact that the CRB cannot award damages has no bearing on whether the issue should be referred to the agency for its expert resolution and determination. The purpose of the referral is not for the agency to resolve every aspect of the claims pending before the district court, but to obtain the agency's authoritative views on the substantive issues. For that reason, cases are not *transferred* to the agency for resolution under primary jurisdiction; rather, they are "referred," with the court retaining jurisdiction over the case to resolve the matter once the agency has weighed in. It is neither unusual nor problematic that SoundExchange would have to return to this court to obtain any damages award.[10]

Moreover, the central case on which SoundExchange relies, *Ryan v. Chemlawn Corp*., 935 F.2d 129 (7th Cir. 1991), is inapposite. The court declined to refer a question to the EPA under primary jurisdiction, not only because the plaintiff sought only damages, but because she asserted only state common-law claims that were "not dependent on any EPA provisions." *Id*. at

[10] Of course, if the CRB determined that Sirius XM's exclusions were permissible under the *Satellite I* determination, or modified the determination to provide some other mechanism to account for exempt performances, SoundExchange will have no damages.

132. In other words, because there were no federal questions presented whatsoever, let alone questions that turned on the proper construction of the EPA's rules or regulations, the court "fail[ed] to understand what role the EPA can play in this suit." *Id.* at 131. To the contrary here, the CRB's role in interpreting its own rate determinations is clear, even if it lacks the power to award the specific damages SoundExchange seeks.

**CONCLUSION**

For the foregoing reasons and those stated in Sirius XM's moving brief, this Court should dismiss or stay the instant proceedings pending referral to the CRB.

Dated: December 20, 2013

Respectfully submitted,

/s/ *Peter D. Isakoff*

Peter D. Isakoff (D.C. Bar No. 358419)
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW Suite 900
Washington, D.C., 20005
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
peter.isakoff@weil.com

R. Bruce Rich (*pro hac vice*)
Todd Larson (*pro hac vice*)
Adam Banks (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
bruce.rich@weil.com
todd.larson@weil.com
adam.banks@weil.com

*Counsel for Sirius XM Radio Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of December, 2013, I caused a true and correct copy of the foregoing Reply Memorandum in Further Support of Sirius XM's Motion to Dismiss to be filed and served using the CM/ECF system, which shall send notice to all counsel of record.

/s/ *Peter Isakoff*
Peter Isakoff