UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUNDEXCHANGE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   **Case No. 1:13 cv 1290 (RJL)** |
| | ) |
| SIRIUS XM RADIO INC., | ) |
| | ) |
| Defendant. | ) |

**FILED**

AUG 2 6 2014

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**MEMORANDUM OPINION**
(August **25**, 2014) [Dkt. #13]

Plaintiff SoundExchange, Inc. ("SoundExchange") brings this action against

defendant Sirius XM Radio Inc. ("Sirius XM") in an effort to recover royalties

SoundExchange claims it is owed under the Copyright Act. *See generally* Compl. [Dkt.

#1].  Sirius XM moves to dismiss the Complaint, or, in the alternative, stay the action,

pursuant to the doctrine of primary jurisdiction.  Def. Sirius XM Radio Inc.'s Mot. to

Dismiss Pl.'s Compl. ("Def.'s Mot.") [Dkt. #13]; Def. Sirius XM Radio Inc.'s Mem. of

Law in Support of its Mot. to Dismiss at 2 ("Def.'s Mem.") [Dkt. #13-1].   After review

of the motion, the applicable law, and the record herein, defendant's motion is

GRANTED and the case is STAYED pending a decision by the Copyright Royalty Board

("CRB").

**BACKGROUND**

Sirius XM is the only satellite digital audio radio service ("SDARS") in the United

States.  Compl. ¶ 2.  The Copyright Act grants entities such as Sirius XM a statutory

license to digitally broadcast copyrighted sound recordings.  17 U.S.C. §§ 112, 114(d)(2);

1

Compl. ¶¶ 1, 13. Statutory licensees pay royalties, but do not have to negotiate with individual copyright owners for every recording they want to broadcast. Instead, regulations implementing the Copyright Act charge SoundExchange, an independent non-profit organization, with collecting the performance royalties from statutory license users—such as SDARS, Internet radio stations, and cable TV music channels—and distributing those royalties to the copyright owners in accordance with 17 U.S.C. § 114(g)(2)(A)-(D). Compl. ¶¶ 10, 15.

The "reasonable rates and terms of royalty payments" SDARS like Sirius XM owe are set by the Copyright Royalty Board, which is comprised of three Copyright Royalty Judges ("CRJs"). 17 U.S.C. §§ 114(f)(1), 801(a)-(b). These CRJs must be experienced attorneys, and at least one judge must have significant knowledge of copyright law and another must have significant knowledge of economics. 17 U.S.C. § 802(a)(1). The Copyright Act directs that the SDARS royalty rates set by the CRB

> be calculated to achieve the following objectives:
> (A) To maximize the availability of creative works to the public.
> (B) To afford the copyright owner a fair return for his or her creative work and the copyright user a fair income under existing economic conditions.
> (C) To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication.
> (D) To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.

17 U.S.C. § 801(b)(1).  To fulfill its statutory mandate, the CRB presides over extensive administrative proceedings, which can involve scores of witnesses and voluminous documents, before issuing its determinations and promulgating regulations.  *See generally* 17 U.S.C. § 803.

Sirius XM[1] and SoundExchange already have met in two such proceedings before the CRB.  In the first, the CRB heard twenty-six days of testimony and admitted more than 230 exhibits before issuing its final determination regarding the royalty rates owed by SDARS from January 2007 through December 2012.  Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 73 Fed. Reg. 4080, 4080-81 (Jan 24, 2008) ("*Satellite I*").  The CRB considered the four statutory factors laid out in 17 U.S.C. § 801(b)(1) and set the SDARS royalty fee as a percentage of gross revenues escalating from 6% in 2007 to 8% in 2012.  *Id*. at 4084.  The CRB further defined "Gross Revenues" as including subscription revenue and advertising revenue attributable to advertisements on channels that do more than "use only incidental performances of sound recordings," but excluding other specific sources of revenue.  *Id*. at 4102; 37 C.F.R. § 382.11(1)(i)-(ii) (2008).  Most relevant here, the CRB explicitly excluded revenue recognized from "[c]hannels, programming, products and/or other services offered for a separate charge where such channels use only incidental performance of sound recordings" and from "[c]hannels, programming, products and/or other services for which the performance of sound recordings . . . is

---

[1] At the time of the first proceeding, Sirius Satellite Radio and XM Satellite Radio were separate companies; they later merged. Pl. SoundExchange's Mem. of Points and Authorities in Opp'n to Def. Sirius XM's Mot. to Dismiss at 1 n.1 ("Pl.'s Opp'n") [Dkt. #17]. "Sirius XM " includes the merged company and its predecessor entities.

exempt from any license requirement or is separately licensed." *Satellite I*, 73 Fed. Reg. at 4102; 37 C.F.R. § 382.11(3)(vi)(B), (D) (2008).

Around five years later, the parties met again in a contested proceeding to determine the SDARS royalty rate for the period from 2013 through 2017. Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 78 Fed. Reg. 23054 (April 17, 2013) ("*Satellite II*"). There, the parties proposed rates and also disputed the revenue base to which the adopted royalty rates would apply—SoundExchange argued to expand the revenue base, and Sirius XM argued to maintain it. *Id.* at 23072. Ultimately, the CRB determined that royalty rates would start at 9% of gross revenues in 2013 and rise to 11% by 2017, *id.* at 23071, and was "satisfied that the exclusions permitted in the Gross Revenues definition remain proper," *id.* at 23072. However, the CRB prescribed a methodology it described as a "deduction" rather than a "revenue exclusion" to handle royalties attributable to pre-1972 recordings. *Id.* at 23073.

SoundExchange now brings this action alleging that Sirius XM underpaid royalties owed from 2007 through 2012 (the subject of *Satellite I*). *See generally* Compl. SoundExchange alleges that Sirius XM "devised its own definition of Gross Revenues – a definition that substantially reduced its royalty payments to SoundExchange." Compl. ¶ 4. Specifically, SoundExchange complains that Sirius XM improperly (1) reduced Gross Revenues by an amount it estimated was attributable to pre-1972 sound recordings; (2) excluded from Gross Revenues the revenue received from the price difference between its standard package and its premier package, the latter of which includes

4

additional talk channels, but no additional music channels; and (3) excluded revenue derived from its *Family Friendly* and *Mostly Music* packages. *Id.* SoundExchange also alleges that Sirius XM failed to make late payment fees required pursuant to 37 C.F.R. § 382.13(d) and related regulations. Compl. ¶¶ 60-63.

Sirius XM argues that the doctrine of primary jurisdiction counsels that the CRB should resolve these issues in the first instance, and, accordingly, moves to dismiss the Complaint, or, in the alternative, stay this action. Def.'s Mot.; Def.'s Mem.

## ANALYSIS

The doctrine of primary jurisdiction allows a court to refer to an administrative agency certain issues within that agency's area of expertise.[2]  Primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. . . . [It] comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 63-64 (1956).  In such instances, the court may stay or dismiss without prejudice the case "pending referral of such issues to the administrative body for its views." *Id.* at 64.

"The primary jurisdiction doctrine rests both on a concern for uniform outcomes . . . and on the advantages of allowing an agency to apply its expert judgment[.]" *Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1120 (D.C. Cir.

---

[2] Courts generally do not actually send cases or issues to an agency for resolution pursuant to this doctrine, but rather refrain from exercising their jurisdiction to allow the parties to raise the dispute to the agency. *See Reiter v. Cooper*, 507 U.S. 258, 268 n.3 (1993).

1992); *see also W. Pac. R. Co.*, 352 U.S. at 64 ("In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. More recently the expert and specialized knowledge of the agencies involved has been particularly stressed." (internal citation omitted)). An agency's expertise extends beyond technical issues "to the policy judgments needed to implement [its] mandate." *Allnet*, 965 F.2d at 1120.

Courts appropriately employ the primary jurisdiction doctrine when an administrative agency "is best suited to make the initial decision on the issues in dispute." *Id.* Administrative agencies may be "better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure" to "ascertain[] and interpret[] the circumstances underlying legal issues." *Far E. Conference v. United States*, 342 U.S. 570, 574-75 (1952). Ultimately, "[n]o fixed formula exists for applying the doctrine of primary jurisdiction." *W. Pac. R. Co.*, 352 U.S. at 64. The court must determine on a case-by-case basis "whether the reasons for the existence of the doctrine are present and whether the purpose it serves will be aided by its application." *Id.* If the court concludes the doctrine does apply, then the court may stay or dismiss without prejudice the proceedings before it while the parties present the issue to the appropriate administrative agency. *See Reiter v. Cooper*, 507 U.S. 258, 268-69 & n.3 (1993).

Sirius XM argues that the two primary disputes in this case are best suited to resolution by the CRB in the first instance, rather than this Court, because both involve interpreting and applying the CRB's regulations on gross revenues. Def.'s Mem. at 1-2. SoundExchange, not surprisingly, contends that neither CRB's definition of "Gross

6

Revenues" nor the exclusions therefrom is ambiguous, and this Court is well-situated to determine whether Sirius XM breached the CRB's clear terms without further referral to the CRB. Pl.'s Opp'n at 8-14. For the following reasons, I agree with Sirius XM and will stay these proceedings.

In order to determine whether to apply the primary jurisdiction doctrine, I must first consider what, precisely, the parties are contesting. Sirius XM is alleged to have excluded from its gross revenue total the revenue it attributed to sound recordings made prior to 1972, which are not subject to the federal statutory license. *See* Compl. ¶ 20. SoundExchange contends that, because Sirius XM did not *recognize* revenue explicitly from the pre-1972 recordings, but rather estimated it based on percentage of recordings played, any exclusion Sirius XM purports to attribute to those recordings does not qualify as an exclusion under 37 C.F.R. § 382.11(3)(vi)(D) for "[r]evenues recognized by Licensee for the provision of . . . [c]hannels, programming, products and/or other services for which the performance of sound recordings . . . is exempt from any license requirement." Pl.'s Opp'n at 9; Compl. ¶ 23.

In *Satellite II*, the CRB agreed with Sirius XM that "pre-1972 recordings are not licensed under the statutory royalty regime and should not factor into determining the statutory royalty obligation." *Satellite II*, 78 Fed. Reg. at 23073. However, it also determined that "the current Gross Revenues definition does not expressly recognize such an exclusion" and that "revenue exclusion is not the proper means for addressing pre-1972 recordings." *Id.* Instead, it fashioned a "deduction" for such recordings. *Id.* SoundExchange argues that this decision confirms that Sirius XM improperly excluded

revenue from 2007 through 2012. Pl.'s Opp'n at 9-10. Sirius XM contends it does no such thing, but rather acknowledges that Sirius XM did not owe royalties for its performance of pre-1972 recordings and prescribes a specific methodology for the royalty calculation going forward. Def. Sirius XM Radio Inc.'s Reply Mem. of Law in Further Support of its Mot. to Dismiss at 4-5 ("Def.'s Reply") [Dkt. #20].

The second issue involves the appropriate royalties owed on Sirius XM's premium subscription package, Sirius XM Premier.[3] During the relevant time period, Sirius XM charged its subscribers $12.95/month for the basic package and $16.99/month for Sirius XM Premier, which includes the same channels provided in the basic package, as well as additional talk channels. Compl. ¶¶ 27-28. Sirius XM excluded from gross revenue the additional revenue it received from subscriptions to Sirius XM Premier above what it would have received if those subscriptions had been for the basic package.

SoundExchange complains that this was not a proper application of 37 C.F.R. § 382.11(3)(vi)(B)'s exclusion for "[c]hannels, programming, products and/or other services offered for a separate charge where such channels use only incidental performance of sound recordings" because a Sirius XM Premier subscriber pays a single fee and does not pay for the additional talk channels with "a separate charge." Pl.'s Opp'n at 9-10; Compl. ¶ 32. SoundExchange contends that this, too, was decided by the *Satellite II* court when it stated in a footnote that "the exclusion is available only to the

---

[3] Sirius XM offers premier packages branded as Sirius Premier, XM Premier, and Sirius XM Premier. Compl. ¶ 4 n.1. I use "Sirius XM Premier" to refer to all three packages.

extent that the channels, programming, products and/or other services are offered for a separate charge." *Satellite II*, 78 Fed. Reg. at 23072 n.45. I disagree.

Unfortunately for SoundExchange, the gross revenue exclusions are ambiguous and do not, on their face, make clear whether Sirius XM's approaches were permissible under the regulations. I agree with Sirius XM that these disputes are best suited to review in the first instance by the CRB. Although uniformity is not a concern here—Sirius XM and SoundExchange are the only two parties affected by the 2007-2012 SDARS rates— the technical and policy expertise of the CRB makes referral to that body appropriate. These are "issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *W. Pac. R. Co.*, 352 U.S. at 64.

Indeed, the CRB was established in part for the purpose of determining "reasonable rates and terms of royalty payments" between parties like SoundExchange and Sirius XM. 17 U.S.C. § 114(f). It is composed of judges with technical expertise in copyright law and economics. *See* 17 U.S.C. § 802(a)(1) (requiring at least on CRJ to have "significant knowledge of copyright law" and another to have "significant knowledge of economics"). And the expertise relevant to a primary jurisdiction decision "is not merely technical but extends to the policy judgments needed to implement an agency's mandate." *Allnet*, 965 F.2d at 1120. Our Circuit has recognized the difficult and multifaceted decisions delegated to the policy judgment of the CRB:

> First, the agency is required to estimate the effect of the royalty rate on the future of the music industry, which requires a forecast of the direction in which the future public interest lies based on the expert knowledge of the agency. Second, the agency has legislative discretion in determining

9

> copyright policy in order to achieve an equitable division of
> music industry profits between the copyright owners and
> users.   Finally, the statutory factors pull in opposing
> directions, and reconciliation of these objectives is committed
> to the agency as part of its mandate to determine reasonable
> royalty rates.

*SoundExchange, Inc. v. Librarian of Cong.*, 571 F.3d 1220, 1223-24 (D.C. Cir. 2009)

(internal quotation marks, citations, and alterations omitted).

In its two prior relevant rate-setting proceedings, the CRB has heard weeks of testimony and reviewed scores of exhibits submitted by these two parties and others in their industry. *See Satellite I*, 73 Fed. Reg. at 4081; *Satellite II*, 78 Fed. Reg. at 23054. Therefore, the CRJs are "especially familiar with the customs and practices of the industry and of the unique market-place involved in this case." *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 305 (1973). When determining and implementing the SDARS statutory royalty rates, the CRB sought to achieve the four policy goals delineated in the Copyright Act at 17 U.S.C. § 801(b)(1). Whether it set the rates intending the types of revenue at issue to be included in or excluded from the gross revenue calculation is a question best posed to the CRB itself. To be sure, the issues here involve "the Commission's interpretation of its own regulations, on which it is owed great deference." *Allnet*, 965 F.2d at 1122.

SoundExchange argues that the CRB already definitively construed both provisions at issue in SoundExchange's favor in the *Satellite II* proceeding. Pl.'s Opp'n at 9-11, 13. But the construction and application of the *Satellite I* rates were not before the CRB in the *Satellite II* proceedings, which were prospective only. It is true that the

10

*Satellite II* panel set forth a different mechanism for dealing with pre-1972 sound recordings than Sirius XM had used previously, but whether Sirius XM's approach was improper such that it owes SoundExchange additional fees for times past is an open question of interpretation and policy. And *Satellite II* did nothing to clarify whether the CRB considers the additional talk channels on Sirius XM Premier to be "offered for a separate charge." These questions remain open.

SoundExchange also questions whether the CRB is authorized to hear the claims at issue. Pl.'s Opp'n at 16. Under the Copyright Act, the CRB has "continuing jurisdiction" to "issue an amendment to a written determination to correct any technical or clerical errors in the determination or to modify the terms, but not the rates, of royalty payments in response to unforeseen circumstances that would frustrate the proper implementation of such determination." 17 U.S.C. § 803(c)(4). Neither party is asking for a change to rates; only a clarification of the terms. This is within the CRB's continuing jurisdiction. If the CRB judges Sirius XM's gross revenue calculations to have been improper, SoundExchange can seek damages in this court.[4]

## CONCLUSION

Our Circuit has opined that, "[i]n general, when primary jurisdiction lies with an administrative agency, the district court should stay the proceedings in front of it, not

---

[4] Sirius XM addresses Counts 3 and 4 of the Complaint only in passing, describing them as "small in size compared with" the other claims. Def.'s Mem. at 9 n.4. It argues that "to the extent the doctrine of primary jurisdiction counsels this Court's deference to the CRB on the principal issues in this case, it counsels deference on these less significant issues as well." *Id.* On the pleadings, I cannot discern whether these are issues that would invoke the CRB's technical expertise or policy judgments. They will be stayed while the case as a whole is stayed, and I leave it up to the parties to determine whether to present the issues underlying Counts 3 and 4 to the CRB.

dismiss the suit." *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*, 31 F.3d 1184,

1187 (D.C. Cir. 1994).  Thus, in the absence of any strong argument to dismiss the case

without prejudice and for all the foregoing reasons, defendant's motion to stay the action

[Dkt. #13] is GRANTED.  The case shall be STAYED pending a decision by the

Copyright Review Board.  An appropriate order shall accompany this Memorandum

Opinion.

RICHARD J. LEON
United States District Judge